No. 3--09--0830

Opinion filed March 30, 2011

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2011

SUSAN D. SPERL, Individually            )  Appeal from the Circuit Court
and as Executor of the Estate           )  of the 12th Judicial Circuit,
of Joseph G. Sperl, Deceased,           )  Will County, Illinois,
                                        )
        Plaintiff-Appellee,             )
                                        )
    v.                                  )
                                        )
C.H. ROBINSON WORLDWIDE, INC.,          )
                                        )
        Defendant-Appellant             )
                                        )
(C.H. Robinson Worldwide-Ltl,           )
Inc., C.H. Robinson Company,            )
Inc., d/b/a C.H. Robinson               )
International, Inc., DeAn J.             )
Henry, Toad L. Dragonfly                )
Express, PBX, Inc., d/b/a Tyson         )
Food Logistics, a Foreign               )
Corporation, Tyson Fresh Meats,         )
Inc., a Foreign Corporation and         )
Michael R. Smith,                       )
                                        )
        Defendants).                    )
_____  )
                                        )
WILLIAM TALUC and SKYE TALUC,           )
                                        )
        Plaintiffs-Appellees,           )
                                        )
    v.                                  )
                                        )

```
C.H. ROBINSON WORLDWIDE, INC.,    )
and C.H. ROBINSON COMPANY,        )
                                  )
      Defendants-Appellants       )   Nos. 04--L--428, 05--L--812,
                                  )          09--L--005
(C.H. Robinson Company, Inc.,     )
C.H. Robinson International,       )
Inc., C.H. Robinson Worldwide-    )
Ltl, Inc., DeAn Henry,            )
Individually and d/b/a DJ         )
Transport, Michael R. Smith,      )
Individually and d/b/a Toad L.    )
Dragon Fly Express, Luann G.      )
Whitener-Black, Individually      )
and d/b/a Toad L. Dragonfly       )
Express,                          )
                                  )
      Defendants).                )
_____    )
                                  )
ANNETTE SANDERS, Individually     )
and as Administrator of the       )
Estate of Thomas S. Sanders,      )
Deceased,                         )
                                  )
      Plaintiff-Appellee,         )
                                  )
      v.                          )
                                  )
C.H. ROBINSON WORLDWIDE, INC.,    )
and C.H. ROBINSON COMPANY,        )
(referred to as C.H. Robinson     )
Worldwide),                       )
                                  )
      Defendants-Appellants       )
                                  )
(C.H. Robinson International      )
Inc., C.H. Robinson Company,      )
Inc., C.H. Robinson Company, LP,)
C.H. Robinson Worldwide           )
Foundation, DeAn J. Henry,        )
Luann G. Whitener-Black and       )
Michael R. Smith, Individually    )
```

2

and d/b/a Toad L. Dragonfly )
Express, ) Honorable
) James E. Garrison,
Defendants). ) Judge, Presiding.
_____

JUSTICE LYTTON delivered the judgement of the court, with opinion.
Justices Holdridge and McDade concurred in the judgment and opinion.
_____


**OPINION**

Plaintiffs, Susan Sperl, individually and as the executor of the estate of Joseph Sperl; Annette Sanders, individually and as the administrator of the estate of Thomas Sanders; and William and Skye Taluc, filed a complaint against, among others, defendant C.H. Robinson Worldwide, Inc., a/k/a C.H. Robinson Company (CHR), for wrongful death and personal injuries they sustained due to DeAn Henry's negligent operation of a tractor-trailer. The jury concluded that CHR was vicariously liable based on agency and entered judgment in favor of plaintiffs in the amount of $23,775,000. The trial court denied CHR's motion for judgment notwithstanding the verdict (judgment n.o.v.) or a new trial. On appeal, CHR claims that (1) the evidence failed to establish an agency relationship, and (2) the trial court erred in refusing to allocate fault with Henry and her employer, Luann Whitener-Black,

3

d/b/a Toad L. Dragonfly Express (Dragonfly).  We affirm.

On the morning of April 1, 2004, Henry was driving a tractor-trailer containing a load of potatoes from Idaho to CHR's warehouse in Bolingbrook, Illinois.  As she approached Plainfield, traveling on Interstate 55, she noticed that the vehicles ahead of her were not moving.  Henry was unable to stop her truck and ran over several vehicles, causing a multiple-car accident.  Joseph Sperl and Thomas Sanders died in the collision, and William Taluc sustained serious injuries.  Henry owned the tractor she was driving and leased it to Dragonfly, a motor carrier.  On that day, Henry was delivering a load for CHR.

Plaintiffs sued Henry, Dragonfly and CHR for wrongful death and personal injuries sustained as a result of Henry's negligence.  Henry and Dragonfly admitted liability.  CHR denied liability and sought contribution from Henry and Dragonfly.

At trial, the evidence revealed that CHR is a logistics company that provides a variety of transportation-related services.  It is a federally licensed freight broker.  At the time of the accident, it was not a licensed motor carrier.  CHR does not own tractor-trailers, nor does it employ drivers.  Instead, CHR sells its services to customers or shippers needing to transport goods and then contracts with carriers to provide transportation for its

4

customers.

A network of federally licensed carriers hauls freight, primarily perishable products, for CHR and its customers. Dragonfly is one of those carriers. In March of 2002, Dragonfly and CHR entered into a contract carrier agreement that was standard for the industry. It provided that CHR was exclusively liable for Dragonfly's freight charges; CHR's customers had no obligation to pay Dragonfly. Dragonfly agreed that all transportation provided to CHR would be performed under the contract. It warranted that it would use competent drivers. Dragonfly also warranted that neither CHR nor its customers were responsible for the drivers' salaries, wages, charges, or worker's compensation expenses. The contract described the relationship between the parties as follows:

"The parties understand and agree that the relationship of Carrier to Robinson [CHR] hereunder is solely that of an independent contract and that Carrier shall and does, employ, retain or lease on its own behalf all persons operating motor vehicles transporting commodities under this Contract."

Once a carrier signed a contract carrier agreement, it could begin to haul loads for CHR. Upon arranging a delivery, CHR issued a load confirmation sheet (LCS) for the load. The LCS identified

5

the carrier, driver, product and rate. It also included any special instructions that applied to the load.

In 2004, Jewel Food Stores began remodeling its supermarket distribution center and searching for an alternative warehouse that could temporarily distribute its perishable products. Jewel representatives knew that CHR was a federally licensed seller of produce and fruit and could handle special projects. CHR was able to offer multiple temperature storage capabilities and could transport perishable items to Jewel's stores. As a result, Jewel entered into a delivery contract with CHR in which CHR purchased produce for Jewel, stored it, and then arranged for transportation to Jewel's various grocery stores.

Henry owned her semi-tractor and leased it to Dragonfly. In the spring of 2004, Dragonfly gave Henry permission to use its carrier authority to book and deliver loads on her own. If Henry booked a load, she kept all the profit. If Dragonfly dispatched Henry, Dragonfly kept 5%.

On March 29, 2004, Henry called Troy Pleasants, a transportation manager in CHR's Bolingbrook office, and requested a load. Pleasants offered a load of potatoes that CHR had recently purchased in Idaho. The potatoes were to be loaded and delivered to CHR's Bolingbrook warehouse, where they would be repackaged and

6

shipped to various Jewel grocery stores.  Pleasants stated that CHR required a refrigerated trailer that measured at least 48 feet in length for the job.  Henry accepted the load for a payment of $1,800, less a $700 advance for fuel.

CHR sent Dragonfly an LCS confirming the shipment.  At the top of the LCS, in bold-face type, it stated: "Driver must call Troy Pleasants for dispatch."  Under the subheading "DRIVER SPECIAL INSTRUCTIONS", it listed the following requirements:

"1.  Driver must make check calls daily by no later than 10 am CST daily or $50 will be deducted from the rate.

2.  Driver must verify package count and/or pallet count being loaded on the truck.

3.  Driver may incur a fine of $500 for being a full day late, without any proof of breakdown.

4.  Driver may incur a fine of $250 for being late for an appt time.

5.  Driver must stay in constant communication with me throughout entire load.

6.  Driver may incur a fine, if he does not call, for any of the following reasons

a.) waiting longer than 2 hours for product

7

***

7.   Driver must call after each pick up and verify that he is loaded.

8.   FAILURE TO NOTIFY FINE: If driver has a 7 am appt for that day of delivery, and has a problem that delays him to make on time delivery, and we do not receive a phone call until after or at the time of the delivery appt:

a.) The carrier will be fined $250

b.) The carrier could also be responsible to cover the loss sales and cost to cover the customer product for that day.

***

9.   Driver must pulp all product being loaded on the truck.  If pulp temperature is plus or minus 2 degrees from the temperature on the dispatch sheet, driver must call their CH Robinson Representative ASAP.

10.   All Drivers must check call the day before delivery no matter what day it is.  If the driver is more than 700 miles out at or before 10 CST driver must check call again at 4 PM.  Any driver 700 miles out after 10 am

8

CST MUST check call at 4 PM CST, and again at 10 PM CST the *** before delivery.

* * * Most importantly, the DRIVER must stay in constant communication with Central Product and/or the night crew service."

At trial, Henry testified that Dragonfly did not dispatch her regarding the load; she contacted Troy Pleasants directly looking for a load to deliver. Henry further testified that she was in constant contact with CHR dispatch throughout her trip. She called Pleasants, or another member of his phone team, five times during her trip, sometimes calling multiple times within a single day. During each phone conversation, Pleasants asked Henry about her location and about the temperature and integrity of the load. Henry stated that, although she did not see the LCS for the load of potatoes, she was aware of the fines CHR could impose because she had worked with CHR in the past. She knew that CHR's fines ranged from $50 to $500 and that multiple fines could be imposed. She was also aware that if she was late delivering a load, a fine would be imposed. Henry testified that she would do "everything [she] could" to avoid a fine. Federal regulations only allowed Henry to drive 10 hours each day. CHR's schedule put pressure on Henry as a driver. Henry stated that, given the amount of time she had to

9

get to Illinois, she would not have been able to deliver the load to the Bolingbrook warehouse within CHR's schedule without violating federal regulations.

On cross-examination, Henry testified that CHR did not instruct her on how to get from Idaho to Bolingbrook. She made the decision to take Interstate 80 to Interstate 55, but she called CHR for directions when she was close to the warehouse. She also testified that had she successfully delivered the potatoes, CHR would have directly deposited the payment into her personal account at Transport Alliance Bank.

Pleasants testified that after talking to Henry on March 29, he filled in the driver's name as "DeAn" on the dispatch sheet and faxed a copy of the LCS to Dragonfly. According to the LCS, Henry was required to stay in constant contact with CHR during delivery. CHR imposed fines on the drivers to ensure timely delivery of a load. He was not surprised that Henry would not make any money on the trip if she followed federal regulations.

Plaintiffs' expert Whitney Morgan agreed that CHR was generally a freight broker but stated that CHR's conduct in this case "also fell outside that definition and into the definition of a motor carrier." Morgan noted that CHR dealt directly with Henry and that if Henry successfully delivered this load, she would be

10

paid directly by CHR. In addition, Henry received a fuel advance from CHR. Morgan noted that Dragonfly did not dispatch Henry. She believed that, for this load, CHR was acting as a motor carrier with respect to dispatch, management and supervision of the load.

CHR trucking expert Michael Napier testified that carriers and brokers dispatch in different ways. Carriers dispatch to determine driver conditions, hours of service, tax obligations and driver qualifications. By contrast, a "broker" dispatches to monitor load characteristics. He opined that CHR acted as a broker in this case, noting that CHR's special instructions and fines were not unusual in the industry.

At the close of the evidence, CHR moved for a directed verdict on the issue of agency. The trial court denied defendant's motion. The jury then returned three general verdicts in favor of plaintiffs. It specifically found that Henry was an agent of CHR at the time of the accident, making defendant vicariously liable for plaintiffs' injuries under the doctrine of respondeat superior. The court entered judgment against CHR. CHR filed a posttrial motion for judgment n.o.v. or, in the alternative, a new trial, which was denied.

STANDARD OF REVIEW

A judgment n.o.v. is properly entered where all the evidence,

11

viewed in a light most favorable to the opponent, so overwhelming favors the moving party that no contrary verdict based on that evidence could ever stand.  Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494 (1967).  In ruling on a motion for judgment n.o.v., the court does not weigh the evidence or reassess the witnesses' credibility.  Maple v. Gustafson, 151 Ill. 2d 445 (1992).  A trial court should not enter judgment n.o.v. if there is any evidence establishing a substantial factual dispute or the determination regarding conflicting evidence is decisive to the outcome of the trial.  Maple, 151 Ill. 2d at 454.  Although we apply a de novo standard of review to the denial of a motion for judgment n.o.v., the Pedrick standard applies on appeal as well.  Jones v. Chicago Osteopathic Hospital, 316 Ill. App. 3d 1121 (2000).

In contrast, on a motion for a new trial, the trial court will weigh the evidence and order a new trial if the verdict is contrary to the manifest weight of the evidence.  Maple, 151 Ill. 2d at 454. A verdict is against the manifest weight of the evidence only where the opposite result is clearly evident or where the jury's finding is unreasonable, arbitrary or not based on the evidence.  Maple, 151 Ill. 2d at 454.  We will not reverse the  court's ruling on a motion for a new trial unless it is affirmatively shown that the trial court clearly abused its discretion.  Id. at 455.

12

ANALYSIS

I.  Agency Relationship

CHR argues that the trial court should have granted its motion for judgment n.o.v. or a new trial because the evidence did not support the jury's finding that a principal-agent relationship existed between CHR and Henry.  Specifically, it claims that the evidence overwhelmingly demonstrated that Henry was an independent contractor and that CHR had no right to control her actions in transporting the load of potatoes.

Generally, a person injured by the negligence of another must seek his or her remedy from the person who caused the injury. Darner v. Colby, 375 Ill. 558 (1941).  The principal-agent relationship is an exception to this general rule.  Woods v. Cole, 181 Ill. 2d 512 (1998).  Under the doctrine of respondeat superior, a principal may be held liable for the negligent actions of an agent that caused a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff. Woods, 181 Ill. 2d at 517.

A principal is vicariously liable for the conduct of its agent but not for the conduct of an independent contractor.  Petrovich v. Share Health Plan of Illinois, Inc., 188 Ill. 2d 17 (1999).  The difference is defined by the level of control over the manner of

13

work performance.  Horwitz v. Holabird & Root, 212 Ill. 2d 1 (2004).  An agency is a consensual relationship in which a principal has the right to control an agent's conduct and an agent has the power to affect a principal's legal relations.  Resolution Trust Corp. v. Hardisty, 269 Ill. App. 3d 613 (1995).  An independent contractor relationship is one in which an independent contractor undertakes to produce a given result but, in the actual execution of the work, is not under the order or control of the person for whom he does the work.  Horwitz, 212 Ill. 2d at 13.

A fact finder's determination of whether an agency relationship exists should be made by considering all of the surrounding circumstances and actions of the parties, without exclusive weight being given to contractual labels or provisions. See Roberson v. Industrial Comm'n, 225 Ill. 2d 159 (2007). Specific conduct can demonstrate by inference the existence of an agency relationship, despite contractual evidence that the parties intended an independent contractor relationship.  Dahan v. UHS of Bethesda, Inc., 295 Ill. App. 3d 770 (1998).

In Roberson, the supreme court emphasized that the label given by the parties in a written agreement will not be dispositive of the employment status.  Although a carrier agreement is a factor to consider, it does not, as a matter of law, determine an

14

individual's agency status. Roberson, 225 Ill. 2d at 183; see also Earley v. Industrial Comm'n, 197 Ill. App. 3d 309 (1990). The trier of fact must also look to the facts of the case to define the relationship between CHR and the drivers transporting the loads. See Petrovich, 188 Ill. 2d at 46. Here, the carrier agreement provided that the relationship of the carrier to CHR was "solely that of an independent contract" and that the carrier employed the drivers. However, there are substantial facts that indicate the existence of an agency relationship.

In determining whether a person is an agent or an independent contractor, the court's cardinal consideration is the right to control the manner of work performance, regardless of whether that right was actually exercised. Commerce Bank v. Youth Services of Mid-Illinois, Inc., 333 Ill. App. 3d 150 (2002). Another significant factor is the nature of work performed in relation to the general business of the employer. Ware v. Industrial Comm'n, 318 Ill. App. 3d 1117 (2000). Other factors to consider are: (1) the right to discharge; (2) the method of payment; (3) the provision of necessary tools, materials, and equipment; (4) whether taxes are deducted from the payment; and (5) the level of skill required. Commerce Bank, 333 Ill. App. 3d at 153; Ware, 318 Ill. App. 3d at 1122. No single factor is determinative, and the

15

significance of each may change depending on the work involved. Roberson, 225 Ill. 2d at 175.

Applying these factors to this case, we find that the jury's decision was not against the manifest weight of the evidence. First, CHR controlled the manner of Henry's work performance. Henry testified that she contacted Pleasants at CHR and asked for a load. CHR required her to have a refrigerated trailer of a specified length. Henry accepted a load of potatoes that CHR had purchased in Idaho for delivery to its warehouse in Bolingbrook. The LCS dictated special instructions concerning the load. Henry did not see a copy of the LCS for the load of potatoes; however, she testified that she was familiar with the LCS requirements based on previous deliveries she had made for CHR. The special instructions required her to pick up the load at a specified time, make daily check calls, and stay in constant communication with Pleasants and other CHR dispatchers. Henry was instructed to notify CHR if she had an accident. She was also required to continuously measure the temperature of the load during her trip. If the load did not register a certain temperature, the LCS required her to call CHR immediately.

CHR enforced its special instructions with a system of fines. Pleasants testified that the fines were imposed as incentives to

16

drivers to get the load delivered on time. Yet, federal regulations mandated that Henry drive 10 hours each day. Henry testified that the schedule imposed by CHR dictated her method of delivery and created pressure on her as a driver to get to her destination. Henry stated that if she followed federal regulations, she would be late delivering her load to the Bolingbrook warehouse; Pleasants agreed with that assessment. These extensive requirements, coupled with Henry's fine-based compliance, directed Henry's conduct during the entire transportation process and support the finding that CHR had the right to control the manner in which Henry performed her job. See Ware, 318 Ill. App. 3d at 1123 (control demonstrated by showing detailed regulations and proving driver was personally responsible for their observance).

Another factor of "great significance" is the nature of the work performed in relation to the general business of the defendant. Ware, 318 Ill. App. 3d at 1122. Here, Henry's services are closely aligned with CHR's business. CHR is in the business of transportation logistics, handling the means and methods of hauling freight for its customers. CHR's business necessarily requires the service of semi-tractor drivers. The nature of Henry's work is hauling freight for customers from one location to another. The

work Henry performs is not unique; it is directly related to, if not the same as, the general transportation business conducted by CHR. In this case, the second factor weighs in favor of an agency relationship.

Other factors also support the jury's verdict. First, CHR controlled the method of payment. Henry called Pleasants and requested a load. Dragonfly was not involved in the negotiations, and once Henry accepted the load, she was dispatched by CHR, not Dragonfly. If Henry successfully completed a delivery, CHR paid her directly by depositing the negotiated fee into her bank account. Second, the evidence indicates that CHR provided the materials for delivery. Although Henry owned her tractor and leased the trailer from Dragonfly, CHR purchased the potatoes and requested delivery to its Bolingbrook facility.

Thus, several of the factors, including the two most pivotal ones, indicate that Henry was acting as CHR's agent at the time the accident occurred. Thus, we cannot say that the jury's decision was unreasonable, arbitrary or contrary to the evidence. Accordingly, the trial court properly denied CHR's motion for judgment n.o.v. or for a new trial.

Nevertheless, CHR asks us to disregard the jury's verdict and follow two federal district cases in which CHR was the defendant,

18

Jones v. C.H. Robinson Worldwide, Inc., 558 F. Supp. 2d 630 (W.D. Va. 2008), and Schramm v. Foster, 341 F. Supp. 2d 536 (D. Md. 2004). In those cases, CHR moved for summary judgment on the issue of liability. Both district courts granted the motion, finding that the carrier driver was an independent contractor and that, as a result, CHR was not liable for the driver's negligence. In Jones, CHR arranged the pick up date and time, communicated information from the shipper regarding the loading and unloading of the cargo and required the driver to make daily calls regarding the status of the shipment. Jones, 558 F. Supp. 2d at 639. In Schramm, CHR directly dispatched the driver, instructed him to pick up and deliver the load at a certain time, gave him directions to the delivery destination and required the driver to call CHR during the trip. Schramm, 341 F. Supp. 2d at 544-45.

We find those cases distinguishable. Critical facts that are present in our case were not present in either Jones or Schramm. Here, CHR owned the product being transported and the load was being delivered to a CHR warehouse. Moreover, CHR imposed fines on Henry to ensure she maintained CHR's schedule during the trip. CHR's special instructions included the potential for multiple fines and forced Henry to violate federal regulations in order to avoid them. These facts support the inference that CHR controlled

19

the details of Henry's operations, schedule and compensation.

The jury heard the testimony, considered the evidence and concluded that CHR had an agency relationship with Henry. That finding was not unreasonable or arbitrary. Considering the evidence in a light most favorable to plaintiffs, we cannot say it overwhelmingly favors CHR. Thus, the trial court properly permitted the jury to decide the case and interpret the inferences to be drawn based on the evidence.

## II. Allocation of Fault

CHR also claims that Henry and Dragonfly should have been included on the jury's verdict form for purposes of allocating fault under section 2--1117 of the Code of Civil Procedure (Code) (735 ILCS 5/2--1117 (West 2008)).

In cases of negligence, section 2--1117 allows a jury to allocate the total fault attributable to the plaintiff among two or more tortfeasors if their fault is greater than 25%. 735 ILCS 5/2--1117 (West 2008). Section 2--1117 also requires that the tortfeasors' liability be capable of being legally apportioned. 735 ILCS 5/2--1117 (West 2008). If liability among the tortfeasors cannot be apportioned, section 2--1117 does not apply. Woods, 181 Ill. 2d at 520.

"When an action is brought against a master based on

allegedly negligent acts of the servant and no independent wrong is charged on behalf of the master, liability is entirely derivative, being founded upon the doctrine of respondeat superior."  Moy v. County of Cook, 159 Ill. 2d 519, 524 (1994).  A principal found to be vicariously liable is not found to be at fault but, rather, only liable by application of the doctrine of respondeat superior. American National Bank & Trust Co. v. Columbus-Cuneo-Cabrini Medical Center, 154 Ill. 2d 347 (1992).  In such cases, there is only a basis for indemnity, not for apportionment of damages between the principal and the agent.  Id. at 353.

In this case, the finding of an agency relationship between CHR and Henry eliminates the possibility of comparing conduct for purposes of apportioning liability.  Henry admitted negligence, and the jury found that she was acting as CHR's agent when the accident occurred.  CHR was only found liable by application of the doctrine of respondeat superior.  Since CHR's liability is exclusively derivative, it is not entitled to an allocation or comparison of fault under section 2--1117 of the Code.

CHR also argues that the trial court should have allowed an apportionment instruction between CHR and Dragonfly because Dragonfly had a contractual relationship with Henry.  CHR claims that Dragonfly is also legally responsible for Henry's negligence

21

based on its carrier lease with Henry.  CHR's argument, however, ignores the jury's finding of an agency between CHR and Henry.  Once that legal relationship was established, CHR became entirely liable for Henry's negligent conduct, which was the proximate cause of the accident.  Dragonfly's relationship with Henry may allow CHR to seek contribution from Dragonfly, but it does not reduce CHR's liability for plaintiffs' damages.  See Woods, 181 Ill. 2d at 519-20.  Thus, the trial court properly denied CHR's verdict form seeking to allocate fault between Henry, Dragonfly and CHR.

CONCLUSION

The judgment of the circuit court of Will County is affirmed.

Affirmed.

22