LEDET, J.,
concurs in part, dissents in part with reasons.
|2I disagree with the majority on the following two points regarding Nurserymen’s alleged master-servant relationship with Ms. Westbrook: (i) its finding that the jury instructions and interrogatories on this issue were erroneous; and (ii) its reversing the jury’s negative finding on this issue. I separately address each of these points below. In all other, respects, I concur in the result reached by the majority.

The jury instructions and interrogatories

The majority finds that the jury instructions and interrogatories on the master-servant relationship between Nurserymen’s and Ms. Westbrook were erroneous and that this error dictates a de novo — as opposed to a manifest error — standard of review of this issue. On appeal, Appellants argue that the jury -instructions on this issue were erroneous for the following three reasons: (i) the instructions included duplicate the instructions for vicarious liability and the |smaster-servant relationship — two doctrines having the same meaning in Louisiana; (ii) the instructions repeat the same or similar exceptions to the doctrines both before and after setting out the doctrines themselves; and (iii) the duplication and emphasis on the negative in the instructions confused the jury. In finding the jury instructions erroneous, the majority relies on none of the above three reasons. Indeed, contrary to Appellants’ contention, the majority acknowledges that the jury instructions sufficiently explained “the master-servant relationship for a single master/employer.” Nonetheless, the majority finds that the instructions were erroneous in that the trial court failed to charge the jury with the legal standard to determine whether Ms. Westbrook may have been the servant of two masters.[1]
*394 In support of drawing a distinction between dual and single master-servant employment, the majority cites the Louisiana Supreme Court’s decision in Morgan v. ABC Manufacturer, 97-0956 (La.5/1/98), 710 So.2d 1077. The majority reasons that the trial court erred in “failing to instruct the jury on the legal standard for dual employment, also known as borrowed employment or the ‘two masters’ rule.” Continuing, the -majority points out that Morgan held “a . jury instruction following the ‘one master’ rule is ‘inconsistent with the current.law of the borrowed servant,-doctrine in Louisiana’ and that giving such an instruction is legal error.” The | majority’s reliance on Morgan to establish the insufficiency of the jury instructions and interrogatories in this case is misplaced.
Morgan, a borrowed servant case, stands for the proposition that when a general employer — the “payroll” or “lending” employer — is engaged in the business of letting out its own employees to a “borrowing” or “special” employer, the géíieral employer continues to be liable for the torts of the “borrowed” employees. See Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 13-2(d) (1996). "This case, however, is not a borrowed servant ease.[2] Regardless, Morgan did not create á new legal standard for determining the existence of a master-servant relationship. See Gonzales v. Shelter Mut. Ins. Co., 11-198, p. 4 (La. App. 3 Cir. 10/5/11), 76 So.3d 144, 147 (noting that Morgan did not enunciate a “novel theory” for vicarious liability and that “[t]he fundamental basis for liability remains Civil Code article 2320.”).[3]
The jurisprudence is well-settled that “a reviewing court must exercise great restraint before it reverses a jury verdict due to an erroneous jury instruction.” Wooley v. Lucksinger, 09-0571, p. 81 (La.4/1/11), 61 So;3d 507, 574. Applying this principle, I would find the trial court’s jury instructions on the master-servant issue were neither erroneous nor inadequate. Nor were the instructions overly confusing. The instructions adequately covered the applicable Louisianá law on the master-servant and vicarious liability issue;- indeed, as noted above, the majority acknowledges this point insofar as the law governing the single master-servant relationship. Contrary to the majority’s suggestion, it was not necessary for the | ¿trial court to instruct the jury that an employee can have two employers — dual employment. The jury was properly instructed on the general principles of Louisiana law pertaining to master-servant and vicarious liability.
Nor do I agree with the majority’s suggestion that the reference to Western Star in the jury interrogatories as Ms. West-brook’s employer resulted in any error in the jury interrogatories. Consistent with the jury charges, the jury interrogatories included the following question that accurately posed to the jury the issue regarding Nurserymen’s liability:
*395 Do you find, by a preponderance of the evidence, that when the accident of December 25, 2008 occurred at approximately 12:05 a.m., that Tammy West-brook was acting in the course and scope of a master/servant relationship with Nurserymen’s Exchange? ■
For all'these above reasons, I would find no error in the jury instructions of interrogatories. Accordingly, I would find that the manifest error standard of review applies to the jury’s finding — its ' negative response to the above interrogatory — that Ms. Westbrook was not acting in the course and scope of a master-servant.relationship with Nurserymen’s.

No master-servant relationship

The other issue on which I disagree with the majority is its reversal of the jury’s finding that there was no master-servant relationship between Ms. West-brook and Nurserymen’s. The majority correctly summarizes the governing principles of Louisiana law regarding vicarious liability. See La. C.C. Art. 2320. A prerequisite for La. C.C. art. 2320 to apply is that the party claiming vicarious liability establish the existence of an' employment — as opposed to an independent contractor — relationship. See Iteld v. Four Comers Const., L.P., 12-1504-06, p. 31 (La.App. 4 Cir. 6/5/13), 157 So.3d'702, 721. The majority finds Nurserymen’s driver instruction sheet (“DIS”) is- “fatal of Nurserymen’s claim of independent contractor status.” I disagree.
|fiThe DIS cannot be considered in a vacuum. To place the DIS in context, it is necessary to consider the supply chain in this case, which consisted of the following. A buyer, Wal-Mart, contracted with a plant broker, Nurserymen’s Exchange, for the delivery of bamboo plants to two of the buyer’s, locations — one in Opelousas, Louisiana; the other in Midland, Tennessee. Nurserymen’s acquired the plants from A.B. Bonsai, which was located in the City of Industry, California.[4] Nurserymen’s contracted with a freight forwarder or shipper, Shipper’s Choice, for freight transport. The agreement between Nurserymen’s and Shipper’s Choice .was. labeled the “Transportation Agreement.” To fulfill its obligations under the Transportation Agreement, Shipper’s Choice contracted ’ with Western Star to transport the plants. Western Star provided a' truck and a driver, Ms. Westbrook.
When Ms. Westbrook picked up thé load of plants át A.B. B.onsai’s nursery in California,. she signed, the DIS as Shipper’s Choice’s agent.[5] In so doing, : Ms. 17Westbrook acknowledged that she read *396 and understood the temperature control requirements set forth in the DIS.[6] According to the DIS, Ms. Westbrook was required to check in daily with the broker — Shipper’s Choice — not Nurserymen’s. The purpose of the DIS was thus to set forth guidelines to protect the plants; any control Nurserymen’s had by virtue of the DIS was for quality control reasons only.[7]
The record further reflects that Nurserymen’s did not have the right to control Ms. Westbrook — it did not control her driving methods; it did not control her days, hours, pay, or rest periods; and it did not control which roads she was allowed or prohibited from traveling on. Ms. Westbrook did not solicit Nurserymen’s for the job; rather, she received the job from her employer, Western Star. Ms. Westbrook testified that it was her decision to travel to her mother’s house in Destrehan, Louisiana, for Christmas, which placed her in the area of the accident. Indeed, the majority acknowledges the following facts that support a finding of lack of control:
Nurserymen’s did not govern the distance or length of time that [Ms.] West-brook was allowed to drive or when and whether she was to take breaks. Neither Nurserymen’s nor Western Star was aware that [Ms.] Westbrook had intended to travel toward Destrehan, Louisiana for the purpose of visiting her mother before the plants were delivered. Nurserymen’s had no prior contact with [Ms.] Westbrook before this load. She was not paid any wages directly by Nurserymen’s and Nurserymen’s did not assess any fines against her.
^Accordingly, I would affirm, as not manifestly erroneous, the jury’s finding that Nurserymen’s was not vicarious liability for Ms. Westbrook’s actions.
For the foregoing reasons, I concur in part and dissent in part.

. As a general rule, the parties must voice specific, contemporaneous. objections before the jury retires to preserve any objection to jury instructions or interrogatories for appeal. See La. C.C.P. art. 1793(C); Chicago Property Interests, L.L.C. v. Broussard, 15-0299, p. 6 (La.App. 4 Cir. 10/21/15), 177 So.3d 1074, 1079, writ denied, 15-2117 (La.1/25/16), 185 So.3d 7⅜8 (noting that "the rule that a party cannot claim improper jury charges as error where he or she fails to timely object to the charges also applies to jury interrogatories"), As noted above, Appellants did not object on the basis the majority relies upon to find an error in the jury instructions and interrogatories — the trial court's failure to charge the jury on dual employment. Nonetheless, "[a] trial judge has a duty to give instructions which properly reflect the law applicable in light of the facts of the particular case. In order to fulfill that duty, he must both require that the jury consider only the correct, law and avoid confusing the jury.” Guidry v. Bank of LaPlace, 94-1758, p. 3 (La.App. 4 Cir. 9/15/95), 661 So.2d 1052, 1055 (internal citations omitted). Similarly, "[i]f the verdict form does not adequately set forth the issues to be decided by the jury (i.e., omits an applicable essential legal principal or is misleading *394 and confusing), such interrogatories may constitute reversible error.” Guidry, 94-1758 at pp. 3-4, 661 So.2d at 1055.

. Nonetheless, the tests for determining if an employee is a borrowed servant are remarkably similar to the tests for determining whether an employee's tort occurred in the • course and scope of employment "because a •primary concern in both instances is Identifying the principal whose work was being done at the time of the injury.” Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 13-2(d) (1996).

. Louisiana Civil Code Article 2320 provides that masters and employers are answerable for the damage- occasioned by their servants in the exercise of the functions in which they are employed.

. When the accident occurred, the plants still belonged to A.B. Bonsai; Nurserymen’s did not purchase the plants until after the accident. The plants were being transported from Bonsai's California nursery to the two Wal-Mart stores — the first one in Opelousas, Louisiana (where half .of the load was being delivered) and the second one in Midland, Tennessee (where the other half of die load was being delivered).

. The DIS was an express requirement of the Transportation Agreement between Nurserymen’s and Shipper’s Choice. The Transportation Agreement included a provision labeled "TEMPERATURE CONTROL/’ which read as follows:
In the event that temperature control is required, CARRIER [Shipper’s Choice] agrees to perform and abide by the instructions provided in the DRIVER INSTRUCTION SHEET as named in Appendix F and properly executed amendments thereto.
Appendix F of the Transportation Agreement-labeled "TEMPERATURE CONTROL REQUIREMENTS” — states the following:
The document below [a form labeled "Driver’s Instruction Sheet" (the "DIS FORM")] applies to all loads shipped requiring temperature control. It will be provided to each driver for loads of this type and should be read thoroughly and signed as indicated on the document.
*396 The DIS that Nurserymen’s provided to Ms. Westbrook when she picked up the plants tracked almost verbatim the language of the DIS FORM. The DIS she signed thus was a requirement of the Transportation Agreement. Indeed, Ms. Westbrook signed the DIS as Shipper's Choice’s agent. Moreover, the Transportation Agreement expressly provided that "Carrier [Shipper's Choice] shall be an independent contractor and shall have exclusive control and direction of the persons operating vehicles or otherwise engaged in such transportation services.”

. The DIS included certain requirements regarding the regulation of the temperature of the load, verifying the case count before loading, and retaining copies of the bill of lading. The DIS also provided that the driver’s failure to return the temperature recorder tape to Nurserymen’s could result in a fine of $150. Although the DIS included a provision allowing Nurserymen’s to impose a fine, this case is distinguishable from Sperl v. C.H. Robinson Worldwide, Inc., 408 Ill.App.3d 1051, 349 Ill. Dec. 269, 946 N.E.2d 463 (2011), which the Appellants cite. In Sperl, the special instructions provided for the imposition of multiple fines on the driver to ensure the delivery schedule was adhered to and "forced [the driver] to violate federal regulations in order to avoid them.” Sperl, 408 Ill.App.3d at 1060, 349 Ill.Dec. 269, 946 N.E.2d at 473. Here, the fine provided for in the DIS was not tied to the timely delivery of the plants; it was simply a part of the temperature control requirements, Appellants’ reliance on Sperl is thus misplaced.

. See DeFeo v. Frank Lambie, Inc., 146 A.D.2d 521, 536 N.Y.S.2d 459, 460 (1989) (holding that instructions as to "whether the shipped goods were to be delivered inside or outside, and as to whether they should be segregated according to type” were akin to instructions as to the address to which the goods were to be delivered and insufficient to establish the control required for a master-servant relationship).