NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 17, 2019
Decided January 6, 2020

**Before**

KENNETH F. RIPPLE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 19-1739

| | |
|---|---|
| MARINA D. KOLCHINSKY and LIDIA L. KOLCHINSKY,<br>    *Plaintiffs-Appellants*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 15 C 10544 |
| WESTERN DAIRY TRANSPORT, LLC, and WD LOGISTICS, LLC,<br>    *Defendants-Appellees*. | Matthew F. Kennelly,<br>*Judge*. |

**O R D E R**

After Marina Kolchinsky and her mother, Lidia Kolchinsky, were severely injured in a car collision with a tractor-trailer in Illinois, they sued the truck driver and the two companies that contracted with him. They filed in federal court based on diversity of citizenship; Illinois law controlled. The district court entered partial summary judgment in favor of Western Dairy Transport, LLC, and WD Logistics, LLC, concluding that the driver was an independent contractor so the Kolchinskys could not hold the companies responsible for the driver's alleged negligence. Because the district court properly classified the driver as an independent contractor, we affirm the summary judgment for the companies.

William G. Bentley, a Colorado citizen and the owner and sole member of Bill Bentley Trucking, LLC, a Colorado company, rear-ended the Kolchinskys' car while driving a tractor-trailer through Illinois.[1] Bentley had just dropped off a load of milk in Minnesota and was en route to Indiana with an empty trailer to pick up another load. Both deliveries had been arranged by WD Logistics, an LLC consisting of Missouri and Texas citizens. WD Logistics instructed Mr. Bentley to transport the milk from Indiana to its destination; how he got to Indiana was up to him. The Kolchinskys, especially Marina, were severely injured in the crash.

At the time Bentley Trucking regularly provided freight-transportation services to WD Logistics according to the terms of a Carrier/Broker Agreement. The nonexclusive agreement provided that Bentley Trucking was an independent contractor and retained "full control" over its personnel and that either party could terminate the agreement upon 30 days' written notice. When Bentley Trucking accepted a job from WD Logistics, it agreed to call the broker daily with a status update, protect the freight, notify the broker of any damage, and inform the broker of delivery. Bentley Trucking was also responsible for determining delivery times but agreed to inform WD Logistics if Bentley (in his capacity as a driver for Bentley Trucking) could not meet the schedule; the broker reserved the right to withhold any resulting damages from Bentley Trucking's pay. Finally, the agreement required Bentley Trucking to pay its employees and provide and maintain its own tractor, fuel, insurance, licenses, and permits.

The Kolchinskys, Wisconsin citizens, sued Bentley in federal court alleging that he negligently collided with their car and asserting more than $75,000 in damages. Citing theories of respondeat superior and vicarious liability, the Kolchinskys also sued Bentley Trucking, WD Logistics, and Western Dairy Transport, an LLC with the same members as WD Logistics.

WD Logistics moved for summary judgment, arguing that because Bentley Trucking was not its agent, the broker could not be held liable for Bentley's negligent driving. In support the company offered evidence showing that WD Logistics did not control how Bentley Trucking performed its work for WD Logistics. It pointed to the agreement, which classified Bentley Trucking as an independent contractor, and to testimony that the parties conducted their business consistently with the terms of the agreement. Bentley Trucking also negotiated the rate for each job, and WD Logistics did

---

[1] The Kolchinskys' claims against Bentley and Bentley Trucking are not part of this appeal.

not withhold payroll-related taxes or insurance. And apart from the few communication requirements set out in the agreement, Bentley Trucking controlled the details of the delivery, including providing and maintaining the tractor, and selecting the driver, the route, the number of hours to drive per day, and where to refuel.

Western Dairy also moved for summary judgment, arguing that the only possible basis for liability against it was through WD Logistics and that it had no business relationship with WD Logistics with respect to the trip at issue. Western Dairy and WD Logistics are owned by the same parent company, but their roles are distinct: Western Dairy owns and leases trucks and trailers and hauls freight, while WD Logistics brokers the hauls. In other words, Western Dairy was a carrier hired by WD Logistics to transport loads for third parties; it also sometimes supplied trailers that other carriers used to haul loads brokered by WD Logistics. Bentley Trucking was one of those other carriers. And Bentley Trucking was the carrier for the load brokered by WD Logistics at the time of the collision.

In their opposition to the motion for summary judgment, the Kolchinskys pointed to several aspects of Bentley Trucking's relationship with WD Logistics that, they argued, supported finding an agency relationship. First, the Carrier/Broker Agreement instructed that when Bentley Trucking was carrying a load, the driver had to call WD Logistics with a daily status update and upon delivery, and also report any damage to the load. WD Logistics paid Bentley Trucking directly and could withhold damages resulting from a late delivery or lost load. Finally, WD Logistics provided Bentley Trucking with trailers to haul the loads and had the power to fire Bentley Trucking, and at the time of the accident, Bentley Trucking was hauling exclusively for WD Logistics.

The judge granted the summary-judgment motions, concluding as a matter of Illinois law that Bentley Trucking was an independent contractor.[2] And because any

---

[2] A federal court exercising diversity jurisdiction must apply the choice-of-law rules used by the state in which the court sits. *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 300 (7th Cir. 2018). When there is no dispute over which state's law applies, the court will apply the substantive law of the state in which the federal court sits. *Med. Protective Co. of Fort Wayne v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). Here, the parties agree that Illinois law applies, and their choice is consistent with Illinois's presumption in personal-injury cases to apply the law of the

possible path to liability for Western Dairy ran through WD Logistics, the details of Western Dairy's relationship to the broker were ultimately irrelevant.

The judge entered a final judgment for WD Logistics and Western Dairy under Rule 54(b) of the Federal Rules of Civil Procedure, which permitted the Kolchinskys to immediately appeal even though their claims against Bentley and Bentley Trucking remain pending. In response to an order from this court, the judge explained that he had entered final judgment because allowing immediate review of the summary-judgment order would be more expedient than trying the case against Bentley and Bentley Trucking alone and then holding a second trial if the appeal was successful.

On appeal the Kolchinskys first argue that a reasonable jury could conclude based on the summary-judgment evidence that WD Logistics and Western Dairy exercised enough control over Bentley Trucking to create an agency relationship. We review a summary judgment de novo, drawing reasonable inferences in favor of the Kolchinskys, the nonmoving parties. *Walker v. Ingersoll Cutting Tool Co.*, 915 F.3d 1154, 1157 (7th Cir. 2019).

Under Illinois law, deciding whether an agency relationship exists requires a multifactor analysis. The "cardinal consideration" for determing the existence of an agency relationship is whether the alleged principal has the "right to control the manner of work performance." *Sperl v. C.H. Robinson Worldwide, Inc.*, 946 N.E.2d 463, 471 (Ill. App. Ct. 2011). Other considerations include whether the nature of the work is in the principal's field, whether the principal has the right to discharge the purported agent, the method of payment and whether taxes are deducted, the provision of equipment, and the level of skill required. *Id.* Though no single factor controls, *id.*, and weighing them is typically a question of fact, a court may decide the question if the underlying facts are not disputed, *Dowe v. Birmingham Steel Corp.*, 963 N.E.2d 344, 351 (Ill. App. Ct. 2011).

We agree with the district judge that the evidence shows as a matter of law that Bentley Trucking was not an agent of WD Logistics. The Kolchinskys' strongest facts in support of an agency relationship are that WD Logistics required Bentley to contact it at various times when carrying its loads, including a daily status call and a call upon delivery, and that WD Logistics could charge Bentley Trucking for damages if a delivery was late or damaged. But none of these facts shows the degree of control that

---

state in which the injury occurred. *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 903 (Ill. 2007).

Illinois courts have required when finding that an agency relationship exists. *See, e.g.,* *Sperl*, 946 N.E. 2d at 471–72 (upholding a finding of agency relationship where the broker specified the trailer length, required the driver to take the trailer temperature regularly, and imposed strict communication requirements and delivery times enforced by fines); *see also Powell v. Dean Foods Co.*, 7 N.E.3d 675, 698 (Ill. App. Ct. 2013) (upholding a finding of agency relationship where the trial evidence showed that the shipping company controlled the drivers' actions, required drivers to wear uniforms, and provided trailers; and the evidence also showed that the driver pulled exclusively for the company for 60 years and used its letterhead).

Meanwhile, courts applying Illinois law consistently have declined to find an agency relationship when a company hires an independent driver to deliver a load to designated persons at designated hours but does not reserve the right to control the manner of delivery. *See Powell*, 7 N.E.3d at 697–98 (citing *Shoemaker v. Elmhurst-Chi. Stone Co.*, 652 N.E.2d 1037 (Ill. App. Ct. 1994), *as modified* (July 12, 1995)); *Manahan v. Daily News-Tribune*, 365 N.E.2d 1045, 1046–47, 1050–51 (Ill. App. Ct. 1977). Even if a broker requires an exclusive relationship, has the power to fire, and sets rules governing the manner of loading the trucks, no agency relationship exists if the broker does not have the power to control the details of the manner of delivery. *See Dowe*, 963 N.E.2d at 351 (finding no agency relationship where a trucking company chose the route, set hours, and provided and maintained equipment and insurance). Here, it is undisputed that WD Logistics and Bentley Trucking adhered to the terms of their agreement, which explicitly states that Bentley Trucking had "full control" over its personnel, was solely responsible for its own operational costs and its equipment, and would perform services as an "independent contractor." *See Manahan*, 365 N.E.2d at 1051 ("If the parties to the relation are bound by a contract which by its terms clearly defines that relationship as that of employer/independent contractor, and the parties abide by that contract, then the contract may be conclusive of their relationship.").

The Kolchinskys' remaining points do not support finding an agency relationship. The fact that Bentley Trucking was hauling exclusively for WD Logistics is irrelevant because the broker did not *require* it. *See Sperl*, 946 N.E.2d at 471 (focusing on the employer's right to control behavior); *see also Trzaska v. Bigane*, 60 N.E.2d 264, 265–67 (Ill. App. Ct. 1945) (finding no agency relationship where the driver is free to refuse a load). Likewise, the fact that WD Logistics provided Bentley Trucking with trailers also cannot support a finding of an agency relationship. *See Petersen v. U.S. Reduction Co.*, 641 N.E.2d 845, 851 (Ill. App. Ct. 1994) (finding no agency relationship despite providing a trailer). And the Kolchinskys' arguments that WD Logistics (as opposed to

the owners of the freight) paid Bentley Trucking directly and had the power to fire the company are somewhat distracting: WD Logistics did not deduct income taxes or social security contributions like it would for an employee, and the Carrier/Broker Agreement provided that either party could terminate the relationship. Bentley Trucking, moreover, was solely responsible for paying all payroll-related expenses for its drivers, including workers' compensation, unemployment, and social security.

The Kolchinskys next argue that Bentley and Bentley Trucking had apparent authority to act for WD Logistics. To support this theory, the Kolchinskys point to various bills of lading from Bentley Trucking's trips—including the trip it completed before the collision—on which Mr. Bentley signed boilerplate forms on behalf of WD Logistics or Western Dairy, some designating him as a pickup "agent." The Kolchinskys also note that the trailer bore Western Dairy's logo and was en route to pick up a load for WD Logistics when the collision happened. The forms, however, more often designated Bentley as "driver." And when Bentley was en route from Minnesota to Indiana, he was not yet working on a job under the Carrier/Broker Agreement. He had accepted a new job for WD Logistics, but it did not begin until he picked up the new load in Indiana, which never happened because of the intervening accident. So regarding the trip in question, Bentley was not acting on the broker's behalf.

And it is difficult to imagine how an apparent-agency theory could fit the facts of this case. The Kolchinskys do not argue that Mr. Bentley ever appeared *to them* as Western Dairy's agent. But even if the bills of lading and Western Dairy's logo could create apparent agency, to survive summary judgment the Kolchinskys needed evidence that could create an inference that their injuries would not have occurred "but for [their] justifiable reliance on the apparent agency." *O'Banner v. McDonald's Corp.*, 670 N.E.2d 632, 634–35 (Ill. 1996). They offered no such facts, and this failure alone is reason enough to reject this theory. *See id.* The undisputed record, moreover, contradicts any such inference: The Kolchinskys stopped their car on the side of the road before they could have seen the truck bearing Western Dairy's logo, and the truck struck their car from behind.

Finally, the Kolchinskys argue that the judge erred in failing to address their argument that Western Dairy could be held liable for the accident based on a joint venture relationship with WD Logistics. But the judge *did* address it—he simply concluded that this argument was irrelevant given his conclusion that any theory of liability against Western Dairy required finding WD Logistics liable (either individually

or as part of a joint venture). We agree with this analysis. The evidence shows that Western Dairy had no part in the transaction leading to Mr. Bentley's fateful trip. And even if there were a joint venture between WD Logistics and Western Dairy, Bentley Trucking was not its agent for the same reason it was not the agent of WD Logistics alone.

                                                                      AFFIRMED