2020 IL App (1st) 200264-U
No. 1-20-0264

SECOND DIVISION
September 29, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| MICHAEL JACKSON and JOYCE JACKSON, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | No. 18 L 3121 |
| | ) | |
| KELLERMEYER BERGENSONS SERVICES, | ) | |
| S & L CLEANING, INC., and ERIC WILLIAMS, | ) | The Honorable |
| | ) | Ronald F. Bartkowicz, |
| Defendants, | ) | Judge Presiding. |
| | ) | |
| (Kellermeyer Bergensons Services, Defendant- | ) | |
| Appellee). | ) | |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held:* Where there was no genuine issue of material fact that the defendant cleaning service was an independent contractor of the moving defendant, the trial court did not err in dismissing the plaintiffs' vicarious liability claims against the moving defendant. The trial court also did not abuse its discretion in utilizing Supreme Court Rule 191(b) to manage discovery on the motion to dismiss brought pursuant to 735 ILCS 5/2-619(a)(9) (West 2018) or in limiting discovery to what was demonstrably relevant to the issue of agency.

¶ 2     Plaintiffs, Michael and Joyce Jackson, appeal from the trial court's dismissal of their

claims against defendant Kellermeyer Bergensons Services (KBS) pursuant to section 2-619.1 of

the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2018)). Plaintiffs argue that the trial court erred in concluding that KBS could not be held liable for the alleged negligence of defendants S & L Cleaning, Inc. (S&L) and William Eric Johnson because S&L was an independent contractor.[1] Plaintiffs also argue that the trial court abused its discretion in limiting the discovery permitted on KBS's motion to dismiss. For the reasons that follow, we affirm.

¶ 3                                               I. BACKGROUND

¶ 4        In March 2018, plaintiffs filed a complaint against defendants sounding in personal injury and loss of consortium. In the complaint, plaintiffs alleged that on the morning of April 12, 2016, Michael was employed and present at a supermarket called Save-A-Lot on the south side of Chicago. As he was walking down an aisle of the store that morning, Michael slipped and fell and was injured. At that time, KBS and S&L, through their agent Johnson, provided floor cleaning and waxing services at Save-A-Lot. Before Michael slipped that morning, Johnson had just finished cleaning, waxing, and buffing the floor. Plaintiffs alleged that Johnson was negligent in doing so, in that he failed to place any warning cones or signs around the area on which he had just worked, and he failed to place any caution tape around the area he had just cleaned, waxed, and buffed.

¶ 5        In response, KBS filed a motion to dismiss plaintiffs' claims against it pursuant to section 2-619.1 of the Code. In that motion, KBS argued, pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2018)), that neither Johnson nor S & L were the agent of KBS, and so KBS could not be held liable for their alleged negligence. Similarly, pursuant to section

---

[1] Johnson was initially named in the case as Eric Williams. Through discovery, the parties learned that his correct name is William Eric Johnson, but there is nothing in the record reflecting that the case caption was ever corrected. For purposes of this decision, we will refer to Johnson by his correct name, as the parties do.

2-615 of the Code (735 ILCS 5/2-615 (West 2018)), KBS argued that plaintiffs failed to allege sufficient facts to support an agency relationship between KBS and Johnson.

¶ 6    During the next few months after the filing of KBS's motion to dismiss, the trial court stayed the period for filing plaintiffs' response to the motion to dismiss and ordered KBS to produce copies of its contracts with Save-A-Lot and S&L, any associated documents, and the names of contact persons at KBS and S&L who handled contract management.

¶ 7    In August 2018, plaintiffs filed an affidavit pursuant to Supreme Court Rule 191(b) (eff. Jan. 4, 2013) in which they stated that they needed to conduct additional discovery on KBS's control over the means and methods of work performed by S&L.  To that end, plaintiffs requested leave to conduct the depositions of Oscar Galvan, KBS's contract compliance manager; Sebastian Luckos, the owner of S&L; Johnson; John Smith, the manager of Save-A-Lot; and an additional, unidentified representative of Save-A-Lot.  Plaintiffs also asked for leave to conduct discovery into emails, electronically stored information (ESI), letters, memoranda of telephone calls, and data from KBS's technology platform, KBS Force.  KBS responded to plaintiff's Rule 191(b) affidavit, moving to strike portions of it on the basis that some of the discovery plaintiffs sought was overbroad, unduly burdensome, and irrelevant.  At a hearing on the issue, the trial court agreed to allow plaintiffs to depose Galvan and Luckos on the issue of KBS's day-to-day control over S & L, if any.  Once those were done, the trial court would revisit the need for any additional discovery.  The trial court specifically declined to permit plaintiffs to discover any emails unless and until plaintiff made a showing that the emails would contribute to the resolution of the issue of agency.

¶ 8    In November 2018, plaintiffs filed a supplemental Rule 191(b) affidavit in which they alleged that Luckos's deposition indicated that KBS retained significant control over S&L's

work at Save-A-Lot. Accordingly, plaintiffs requested leave to conduct additional discovery in the form of interrogatories, requests for production, and depositions, although they did not provide any specifics regarding what information would be sought or from whom it would be sought. KBS responded to the supplemental Rule 191(b) affidavit by arguing that plaintiffs had failed to include the requisite specificity regarding their requested discovery, no additional discovery was necessary to resolve the agency issue, and full discovery was premature at this point in the litigation. At the hearing on the matter, the trial court agreed to permit plaintiffs to depose Johnson, after which the trial court and parties would revisit the issue of whether additional depositions were necessary.

¶ 9    In March 2019, plaintiffs filed a second supplemental Rule 191(b) affidavit. In it, they argued Johnson's deposition testimony demonstrated that KBS retained control over S&L's work at Save-A-Lot. They further asserted that they needed to conduct additional discovery into the amount of control KBS exercised over S&L's work at nine other Save-A-Lot stores over the previous ten years. KBS responded that additional discovery was not warranted because Johnson did not testify that KBS told him what to do or how to do it. At the next hearing, the trial court agreed to allow plaintiff to take the deposition of Galvan and ordered KBS to produce any emails between KBS and Luckos related to the Save-A-Lot store at issue for the six months preceding Michael's fall. At a subsequent hearing in May 2019, the trial court also ordered S&L to produce all emails from and to KBS regarding the Save-A-Lot store at issue for the six months preceding Michael's fall. However, the court declined to order the production of all emails between KBS and S&L related to all stores for the entirety of the relationship between KBS and S&L. The court reasoned that the relevant relationship was that involving only the store at which

Michael fell. Additionally, the trial court denied plaintiffs' request to depose Bob Hartmann, a KBS account manager who oversaw the store at issue.

¶ 10      Finally, at a status hearing in June 2019, plaintiffs renewed their request to conduct discovery into all emails between KBS and S&L for all ten stores that S&L serviced for the entire 10-year period that KBS and S&L had worked together. Plaintiffs also requested again that they be allowed to depose the store manager for the Save-A-Lot at issue. The trial court again denied these requests, finding that plaintiffs had all the information they needed to respond to KBS's motion to dismiss.

¶ 11      In July 2019, plaintiffs filed their response to KBS's motion to dismiss. In the response, they argued that both S&L and Johnson were the agents of KBS and that, even if they were not, KBS retained sufficient control over their work to be held liable for the negligence of S&L and Johnson. Plaintiffs also argued that they alleged sufficient facts in their complaint to support a finding of agency. In reply, KBS denied any agency relationship between KBS and S&L or between KBS and Johnson. At plaintiffs' request, the trial court permitted them to file a surreply.

¶ 12      In support of their respective positions, the parties submitted a number of exhibits. Of relevance were the following. First, KBS submitted the affidavit of Galvan. In that affidavit, Galvan asserted that as part of his duties as KBS's Contract Compliance Manager, he was responsible for handling the subcontract with S&L. He stated that KBS did not issue directions or requirements to subcontractors related to their attire, work uniforms, clothing vehicles, advertisement, logo usage, or other commercial illustrations. KBS did not issue work uniforms or attire, placards, or images for use by subcontractors in advertisement, identification, or performance of the subcontracted services. He also denied that KBS issued or otherwise

provided S&L with work uniforms or attire, placards, or images for the work performed at the Save-A-Lot at issue.

¶ 13        Attached to Galvan's affidavit was a copy of the "Independent Contractor Agreement" between KBS and S&L dated March 23, 2016 (2016 Contract). The recitals of the 2016 Contract state that both KBS and S&L were in the business of providing janitorial and maintenance services for commercial properties and that KBS desired to contract with S&L to perform the janitorial and maintenance services for customers with whom KBS had existing contracts. The 2016 Contract described the relationship between KBS and S&L as follows:

> "3.        **Relationship of the Parties.**        Independent Contractor acknowledges, understands, and agrees that the Services and obligations performed by Independent Contractor shall be performed as a contractor independent of KBS. This Agreement is not intended to create an employer-employee relationship, nor a partnership, joint venture, or other agency relationship between the Parties, and neither party shall have the authority to bind the other in any such respect. Independent Contractor and its agents, employees, and/or representatives under no circumstances shall be deemed employees of KBS. Independent Contractor assumes full responsibility for compliance with insurance, labor, tax, and all other laws, regulations, and obligations applicable to Independent Contractor as a consequence of its performance of the Services and its performance of all other terms pursuant to this Agreement."

In addition, the 2016 Contract outlined the following with respect to control over the work to be performed:

> "**11.        Independent Contractor's Exclusive Right to Control.**        In all cases, and without exception, Independent Contractor has the sole authority and responsibility to

determine the method, details, manner and means of performing the Services. Independent Contractor has the exclusive authority to hire, discipline, terminate, and set the wages of its employees; KBS may not dictate to Independent Contractor any of these conditions. KBS may only dictate Services as they are dictated to KBS by the Customer(s). Independent Contractor, at its sole cost and expense, shall supply all equipment, tools, materials, and supplies necessary to perform the Services. KBS shall not be responsible for Independent Contractor's employees or other persons whom they utilize to perform the Services. All persons used by Independent Contractor to perform the Services shall be the exclusive responsibility of Independent Contractor, and all such obligations owed to persons used by Independent Contractor to perform the Services, including, without limitation, payment of wages, workers' compensation coverage, payment of employment taxes and insurance premiums, sick leave, vacation benefits, pension or retirement benefits, social security benefits, termination pay, or any other employee benefits owed for services rendered to Independent Contractor in connection with this Agreement, shall be the exclusive responsibility of Independent Contractor."

The 2016 Contract referred to the contract between KBS and S&L executed in 2010 (2010 Contract) for the list of Customers, start dates, service frequency, pricing, scope of services, billing requirements, and any other guidelines for each customer.

¶ 14 The 2010 Contract included a scope of services addendum, which listed the tasks to be performed on a per-visit, weekly, monthly, quarterly, bi-annual, and annual basis, depending on whether a store was serviced on a three-, five-, or seven-day program. These tasks included things such as emptying trash cans, filling soap or towel dispensers, mopping floors, sanitizing water fountains, and cleaning railings. Although most tasks were listed in general terms, some

provided that they should be performed using specific tools or cleaners: scraping gum off the floor using a putty knife, burnishing the floor using a high speed propane floor machine, mopping the floor with a specific cleaner provided by Save-A-Lot.

¶ 15        KBS also submitted S&L's corporate information as reflected on the Illinois Secretary of State's website. That information listed Luckos as S&L's registered agent with an address of 3353 North Keating in Chicago.

¶ 16        Plaintiffs submitted the deposition of Luckos in support of their position. Luckos testified that he owned S&L. When he first obtained a contract with KBS, he was assigned three Save-A-Lot stores. By the time he stopped working with KBS, he had ten Save-A-Lot stores. Luckos did not negotiate the price he was to be paid under his contract with KBS, but he testified that he had a choice in whether to accept it. KBS made him an offer and he had the option to accept or decline it; he accepted. Because he had signed a contract with KBS, Luckos considered himself to be employed by KBS. He also testified that KBS told him that if he was asked, he should say that he worked for KBS.

¶ 17        When he first obtained a contract with KBS, KBS did not provide him with any training or any rules outside the terms of the contract. Luckos denied that KBS ever gave him or his subcontractors uniforms, placards for their vehicles, signs, or anything else with the KBS logo. He also denied that he was provided training by KBS or that KBS instructed his employees on how to mop or run a floor buffer.

¶ 18        Luckos testified that during the course of the contracts with KBS, two KBS "area managers"—Cindy Fiduccia and her successor, Bob Hartmann—would visit the stores approximately once a month per store, on a random basis, to check the work performed by S&L. On the occasions Luckos was present during these visits, he observed Fiduccia or Hartmann

walk around the store, check the conditions of the store, and speak with the store manager. If they identified an issue with S&L's work and Luckos was present, they would tell him. If Luckos was not present and there was an issue with the cleanliness of a store, Fiduccia or Hartmann would email him. Sometimes, Hartmann would also call him. Examples of issues they raised with him included the backroom floor not being clean enough, or the corners or edges of the freezers being dirty. Luckos denied that they ever told him how to do any of the tasks, although he did testify that Hartmann would sometimes offer suggestions on how to address an issue, such as using a "Doodlebug" rather than a mop to clean the edges of the floor by the freezers. When questioned further about it, Luckos testified that he—or his subcontractor— would be informed that something was dirty and needed to be cleaned, but they would not be given specific instructions on how to clean it.

¶ 19 Luckos testified that when his employees would arrive at one of the stores to work, they would use a store phone to call a system utilized to track the hours S&L employees were at the stores. The employees would also use this system to check out before they left the store each day. Luckos did not know, however, whether that system was owned by KBS or Save-A-Lot.

¶ 20 Luckos testified that KBS had the right to have him fire employees with whom KBS was unhappy, but that never occurred. He also testified that KBS had to approve the people he hired and that they performed background checks on some of the people he hired. At the same time, however, he testified that he only hired subcontractors. When questioned about that in light of the prohibition of him subcontracting his work under the contracts with KBS, Luckos testified as follows:

> "Q So whenever you hired a subcontractor, did you let Bergensons know that you were doing it?

A No. They never checked on my workers. I had no responsibility of that. Nobody asked me who I'm hiring and what conditions."

¶ 21    The only equipment KBS ever supplied to him were Doodlebugs and batteries for his scrubber on one occasion. Luckos described Doodlebugs as "a little square with a pad under it" that is used for cleaning edges, stripping and waxing floors, and getting under shelves. KBS supplied these on two or three occasions when Save-A-Lot had requested some additional work; otherwise Luckos provided his own. Luckos provided buffers, scrubbers, bags, and mop heads. Save-A-Lot provided strip wax, soap, toilet paper, and garbage bags.

¶ 22    Plaintiffs also submitted the transcript of Johnson's deposition. He testified that he was employed with S&L between September 2014 and January 2018 at the Save-A-Lot where Michael fell. During that time, he cleaned the floors and the bathrooms of the store. Luckos instructed him on what to do and the order in which to do it. When he first started, Luckos provided him with two days of training on how to perform his work. Luckos also provided all the equipment he used to clean, but Save-A-Lot supplied the cleaning solution he used to clean the floors. He was required to clock in and out of work via an automated phone system. He did not know who owned and operated that phone system. He was paid twice per month. He received his paychecks from Luckos, and the address on the checks was 3353 North Keating in Chicago. He was not provided any uniforms or any placards, signs, or anything else with any company log to put out or wear.

¶ 23    About once per week, a man named Bob would come to check Johnson's work. Johnson believed Bob to be a branch manager with S&L. On the days he visited, Bob would arrive at the store between 7 and 7:30 a.m. When he arrived, Bob would speak to Johnson, look around the store at the floors, and talk to the store manager. Bob would then return to talk to Johnson to let

him know if everything looked good or if something needed to be done. When Bob would speak to Johnson, he would ask if certain tasks had been done, ask if Johnson would do something, or point out something that needed to be done. For instance, if the edges of the floors had not been done, there was a scratch on the floor, or the backroom floor was not complete, Bob would point that out or ask him to clean it. Bob did not, however, tell him how to perform these tasks. On the occasions that Bob would point out to Johnson something that needed to be done or corrected, he would also call or text Luckos about it. Luckos would then talk to Johnson about the issue. Bob never told him to stop working or that he was being unsafe. Bob also never called or texted Johnson.

¶ 24    Johnson did not know who or what KBS was. If he was asked who he worked for, Luckos told Johnson to say S&L. Luckos never told him to say that he worked for KBS.

¶ 25    On November 11, 2019, after considering the arguments and evidence submitted by the parties, the trial court issued its opinion and order, in which it concluded that there was no genuine issue of material fact that KBS did not exert control over S&L such that S&L could be considered the agent of KBS. The trial court concluded that based on the language of the 2016 Contract, Luckos's testimony, Johnson's testimony, and Galvan's affidavit, it was clear that KBS did not exert any control over S&L's operations, and thus S&L could not be considered KBS's agent. At best, the evidence presented by plaintiffs demonstrated KBS was simply ensuring contract compliance by S&L but did not control the method or manner of the work. Accordingly, the trial court granted KBS's motion to dismiss under section 2-619 of the Code.

¶ 26    Thereafter, KBS filed a motion for clarification or, in the alternative, a finding pursuant to Supreme Court Rule 304(a) (eff. Mar. 8, 2016). In that motion, KBS noted that the November 11, 2019, order did not explicitly state that all of the claims against KBS were dismissed with

prejudice and that there was no just reason to delay enforcement or appeal. KBS asked that the trial court clarify that the November 11, 2019, order encompassed such findings or, in the alternative, to now make the findings that the claims were dismissed with prejudice and that there was no just reason to delay enforcement or appeal of the November 11, 2019, order. In response, on January 13, 2020, the trial court entered an order granting KBS's motion for clarification and explicitly stating that the plaintiffs' claims against KBS were dismissed with prejudice and that there was "no just reason to delay appeal, pursuant to Illinois Supreme Court Rule 304(a)."

¶ 27     Plaintiffs then instituted this appeal.

¶ 28                                    ANALYSIS

¶ 29     On appeal, plaintiffs argue that (1) the trial court erred in concluding that KBS did not exert sufficient control over S&L to consider S&L to be an agent of KBS; (2) even if S&L was not an agent of KBS, KBS retained sufficient control over S&L to be held liable for S&L's alleged negligence; and (3) the trial court abused its discretion in limiting the discovery plaintiffs were allowed to conduct before responding to KBS's motion to dismiss. We disagree with plaintiffs on all three contentions.

¶ 30                                    Agency

¶ 31     Plaintiffs first argue that the trial court erred in concluding that there was no genuine issue of material fact that S&L was an independent contractor rather than an agent of KBS. It is well established that a principal may be held vicariously liable for the negligence of its agent, but not for the conduct of an independent contractor. *Pekin Insurance Co. v. Lexington Station, LLC*, 2017 IL App (1st) 163284, ¶ 35. Whether a party is an agent or an independent contractor is determined after considering all of the surrounding circumstances and the actions of the

parties. *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1057 (2011). In fact, where the conduct of the parties demonstrates the existence of an agency relationship, the parties' contract labeling the relationship as an independent contractor relationship is not decisive. *Pekin Insurance*, 2017 IL App (1st) 163284, ¶ 35.

¶ 32       In determining whether an agency relationship exists, the court must examine a number of factors, including, but not limited to, the right to control the manner in which the work is done, the method of payment, the right to discharge employees, the skill required in the work to be performed, and who provides the tools, material, and equipment. *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 75 (2008). Although none of these factors are determinative, the right to control the manner in which the work is performed is the most important. *Id.* In fact, the difference between an agent and an independent contractor is defined by the level of control the principal has over the work performed:

> "The difference is defined by the level of control over the manner of work performance. [Citation.] An agency is a consensual relationship in which a principal has the right to control an agent's conduct and an agent has the power to affect a principal's legal relations. [Citation.] An independent contractor relationship is one in which an independent contractor undertakes to produce a given result but, in the actual execution of the work, is not under the order or control of the person for whom he does the work." *Sperl*, 408 Ill. App. 3d at 1057.

As the party seeking to charge KBS as the alleged principal, the burden of proving the existence of an agency relationship and the scope of the authority within that relationship is on plaintiffs. *Daniels*, 382 Ill. App. 3d at 75.

¶ 33    KBS's motion to dismiss was filed pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1), which permits the filing of motions pursuant to sections 2-615, 2-619, and 2-1005 of the Code (735 ILCS 5/2-615, 2-619, 2-1005 (West 2018)) in a single motion.  The trial court dismissed plaintiffs' claims pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9)), which provides for the dismissal of a complaint on the basis that the claims are "barred by other affirmative matter avoiding the legal effect of or defeating the claim."  In evaluating a section 2-619 motion to dismiss, all well-pleaded facts in the complaint and all reasonable inferences that can be drawn therefrom are to be viewed in the light most favorable to the plaintiff.  *Weisberg v. Chicago Steel*, 397 Ill. App. 3d 310, 312 (2009).  The trial court should not resolve issues of fact on such a motion without an evidentiary hearing, making the question on appeal whether a genuine issue of material fact exists and whether the defendant is entitled to judgment as a matter of law.  *Id.*  Our standard of review is *de novo*.  *Id.*

¶ 34    As an initial matter, we note that there appears to be some confusion amongst all the parties about who, exactly, plaintiffs claim is the agent of KBS.  This confusion is understandable given how frequently plaintiffs have changed position—or at least how inconsistently they have expressed their position.  In their complaint, plaintiffs alleged that Johnson was the agent of both S&L and KBS but did not allege any agency relationship between S&L and KBS.  In their response to KBS's motion to dismiss, however, plaintiffs argued that both Johnson and S&L were the agents of KBS.  On appeal, the plaintiffs argue in their opening brief only that S&L was the agent of KBS.  In their reply brief, however, plaintiff also argue a direct agency relationship between KBS and Johnson.  For purposes of this appeal, we review only whether S&L was an agent of KBS.  That is the issue plaintiffs presented to us in their opening brief.  To the extent that they raised the question of Johnson's agency in the trial court

or in their reply brief, that question is waived. Ill. Sup. Ct. R. 341(h)(7) (eff. May 25, 2018) (stating that an appellant's opening brief "shall contain the contentions of the appellant and the reasons therefor" and that "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"). Moreover, assuming that Johnson was an employee of S&L,[2] an assumption that appears to be made by both sides, a conclusion that S&L was an agent of KBS would also encompass Johnson.

¶ 35        With respect to the merits of the issue of whether there exists a genuine issue of material fact regarding the nature of the relationship between S&L and KBS, plaintiffs acknowledge that the 2016 Contract expressly states that S&L is an independent contractor of KBS and shall not be deemed an employee of KBS. As discussed above, however, the terms of the 2016 Contract do not exclusively control the determination of whether S&L was KBS's agent if the parties' conduct demonstrates otherwise.

¶ 36        Looking to the relevant factors discussed above, we conclude that the trial court correctly found, based on the evidence before it, that there was no genuine issue of material fact that S&L was an independent contractor. Of greatest importance in reaching this conclusion is the dearth of evidence suggesting any control by KBS over the manner in which S&L performed the work. First, the 2016 Contract explicitly stated that S&L had the exclusive right to control the method, manner, and means of performing the contracted-for services. The testimony of Luckos and Johnson confirmed this. Luckos testified that KBS never provided him any training on how to perform the work and KBS never told him or his employees how to do the work. Similarly,

---

[2] We only assume that Johnson is an employee of S&L for purposes of this appeal, because both plaintiffs and KBS appear to make this same assumption and because it has no impact on our conclusion of whether there existed a genuine issue of material fact regarding whether S&L was an agent of KBS. We note, however, that Luckos's testimony that he did not have any employees, but instead only hired independent subcontractors, raises a question of the true nature of the relationship between S&L and Johnson. That question, however, has no impact on our decision here.

Johnson testified that Luckos was the person who trained him on how to perform the work and the order in which to do it. Although plaintiffs make much about the fact that Hartmann would visit the store and check the work performed by Johnson on behalf of S&L, both Luckos and Johnson clearly testified that Hartmann only pointed out tasks that needed to be performed or corrected, but did not instruct Luckos or Johnson on how those tasks were to be performed.

¶ 37 Plaintiffs also claim that KBS controlled the manner in which S&L performed the "janitorial and maintenance services" by identifying the specific tasks to be completed in the 2016 Contract's scope of services and by requiring that certain tools and products be used. Although it is true that the scope of services identified the specific tasks to be performed and how often, that is not the same as controlling the manner in which those tasks are to be performed. In listing the specific tasks to be performed, KBS was simply identifying the nature and extent of the janitorial and maintenance work to be performed by S&L. It was not, as plaintiff contends, requiring S&L to perform those tasks in any specific way. Moreover, we think it is unrealistic, as plaintiffs' argument implies, to expect an employer to limit the description of the desired services to vague terminology or risk being held liable for the potential negligence of the contractor. For example, it would be absurd for a person to hire a general contractor to build a house but to be unable to dictate the number of bedrooms and bathrooms or the size of the kitchen for fear of later being found to be the employer of the general contractor.

¶ 38 In addition, plaintiffs contend that by requiring S&L to utilize certain tools in performing its work, KBS exerted control over the manner in which S&L performed the work. For example, among many others, the scope of services included the following task: "Using a Putty Knife, Scrape up Stickers, Gum, etc. from Floor." The 2016 Contract also required S&L to provide certain equipment: propane buffers, "Buffing Pads—ETC Aqua Plus or equivalent for 3 day

store services," "Buffing Pads—ETC Gorilla Lite or equivalent for 5-7 day store services," propane tanks, auto scrubbers, red scrubbing pads, pressure washers, putty knives, rags, window squeegees, and germicidal cleaner/disinfectant. According to plaintiffs, by not leaving it within the discretion of S&L whether to use a putty knife or other scraper to scrape the floors, whether to use a propane or electric buffers, or to choose the brand of buffing pads, KBS controlled the manner in which S&L performed the work.

¶ 39    We disagree that the requirement that S&L use a putty knife to scrape the gum or that S&L provide certain equipment for the work necessitates a conclusion that KBS exerted control over the manner in which S&L performed the work with that equipment. S&L was still free to perform the identified tasks using its own methods, techniques, tricks, and order. There was no requirement that S&L operate the buffers in a certain direction or pattern, at a specific speed, or with a set pressure or that S&L employ a certain method of removing gum and stickers from the floor. Moreover, the list of equipment included in the 2016 Contract appears to be intended as a notice to S&L of what tools will be necessary to complete the tasks and which of those tools will be provided to S&L and which will not. Although the list identifies specific brands of buffing pads, it also states that the equivalent may be used, leaving the ultimate decision to S&L. Certainly, given the dearth of any other evidence suggesting control by KBS, this factor alone, even if credited, does not support a conclusion that KBS controlled the manner in which the overall work by S&L was performed.

¶ 40    The other factors also support a conclusion that S&L was not an agent of KBS. With respect to payment, KBS made payment to S&L and then S&L made separate payment to Johnson, rather than KBS paying Johnson directly, as would be expected if S&L and its workers were employees of KBS. As for the right to discharge employees, plaintiffs argue that KBS had

the right to discharge S&L employees. Although Luckos testified that KBS could fire his employees, he also testified that KBS never did so. In addition, the 2016 Contract clearly states that S&L had the "exclusive authority to hire, discipline, terminate, and set the wages of its employees; KBS may not dictate to [S & L] any of these conditions." Plaintiffs also argue that S&L did not provide any particular skill, because "[a]nyone can empty trash and mop floors." Although it is true that these might be tasks that could be accomplished by many people, it is an inaccurate statement that this was the extent of services provided by S&L. The scope of services indicate that S&L provided deep commercial cleaning and maintenance that the average person would be unfamiliar with and utilized equipment that would require training to operate. Finally, with the exception of two or three occasions over 10 years when KBS provided Doodlebugs for some extra work requested by Save-A-Lot, KBS did not provide any of the tools, materials, or equipment necessary for S&L to perform its work.

¶ 41    We note that plaintiffs contend that the determination of whether S&L was an independent contractor or agent of KBS is governed by section 220 of the Restatement (Second) of Agency. That section defines a servant and identifies the factors to assess in making the determination of whether a party is a servant. The definition of servant, however, is not coextensive with the definition of agent. Rather, the definition of an agent is broader than the definition of a servant, and a servant is a subcategory of agents, such that one may be an agent without being a servant. See *Hills v. Bridgeview Little League Association*, 195 Ill. 2d 210, 234-35 (2000). Given that we have determined, for the reasons discussed above, that S&L was not an agent of KBS under the broader definition of agent, it necessarily follows that S&L also was not a servant of KBS.

¶ 42    In sum, based on the evidence presented by the parties on KBS's motion to dismiss, we hold that the trial court was correct in concluding that there existed no genuine issue of material fact that S&L was an independent contractor, not an agent, of KBS.

¶ 43                        Retained Control

¶ 44    Plaintiffs next argue that even if S&L was not an agent of KBS, KBS retained sufficient control over S&L to be held liable for S&L's alleged negligence.  In support, plaintiffs rely on section 414 of the Restatment (Second) of Torts, which reads:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

According to plaintiffs, section 414 is an exception to the general rule that a hiring party is not vicariously liable for the negligence of an independent contractor.  Therefore, plaintiffs argue, even if S&L was an independent contractor, KBS could still be liable for S&L's negligence if KBS retained sufficient control over S&L.

¶ 45    Plaintiffs' argument fails, however, because section 414 does not provide a basis on which to find a principal vicariously liable for the negligence of an independent contractor. Instead, as our supreme court thoroughly explained in *Carney v. Union Pacific Railroad Co.*, 2016 IL 118984, ¶¶ 36, 38, "section 414 takes over where agency law ends" and "articulates a basis only for imposition of direct liability."  (Internal quotations omitted.)  This is evidenced by the express language of section 414, which provides that an employer who retains sufficient control is liable for physical harm "caused by *his* failure to exercise his control with reasonable care."  (Emphasis added.)  Section 414 does not, in any way, provide for liability on the part of

the employer for the negligence of the independent contractor. *Id.* at ¶ 39 ("[S]ection 414, as already discussed, addresses only the direct liability of the employer for its own negligence and not vicarious liability, under agency principles, for the contractor's negligence.").

¶ 46    Here, plaintiffs do not seek to hold KBS liable for its own negligence in any way. In fact, plaintiffs have not alleged any negligence on the part of KBS at all. Instead, plaintiffs only seek to hold KBS vicariously liable for S&L's and Johnson's alleged negligence. As discussed above, section 414 only provides a basis for holding an employer liable for its own negligence; it does not provide any basis on which to find KBS liable for the negligence of S&L or Johnson. Accordingly, plaintiffs' contention in this respect does not warrant reversing the trial court's dismissal of plaintiffs' claims against KBS.

¶ 47                                    Discovery

¶ 48    Finally, plaintiffs argue that the trial court abused its discretion in limiting the discovery they were allowed to conduct before responding to KBS's motion to dismiss. Discovery on motions to dismiss brought pursuant to section 2-619 of the Code is governed by Supreme Court Rule 191(b), which provides as follow:

> "If the affidavit of either party contains a statement that any of the material facts which ought to appear in the affidavit are known only to persons whose affidavits affiant is unable to procure by reason of hostility or otherwise, naming the persons and showing why their affidavits cannot be procured and what affiant believes they would testify to if sworn, with his reasons for his belief, the court may make any order that may be just, either granting or refusing the motion, or granting a continuance to permit affidavits to be obtained, or for submitting interrogatories to or taking the depositions of any of the persons so named, or for producing documents in the possession of those persons or

furnishing sworn copies thereof. The interrogatories and sworn answers thereto, depositions so taken, and sworn copies of documents so furnished, shall be considered with the affidavits in passing upon the motion."

We review the trial court's denial of a Rule 191(b) motion for discovery for an abuse of discretion. *National Tractor Parts Inc. v. Caterpillar Logistics Inc.*, 2020 IL App (2d) 181056, ¶ 69. An abuse of discretion occurs when no reasonable would accept the view adopted by the trial court. *Id.*

¶ 49    Plaintiffs first argue that the trial court erred in "dribbl[ing] out discovery by case management conferences and Rule 191(b) [a]ffidavits which prolonged the discovery process." According to plaintiffs, discovery on motions to dismiss usually consists of interrogatories, requests for production, and depositions, each of which is to be completed within its own timeframe. In other words, plaintiffs appear to believe that they should have been permitted to conduct discovery on the motion to dismiss in the same manner that they would have been permitted once the case advanced past the pleading stage and into the full discovery stage. Plaintiffs do not, however, cite any authority in support of this proposition, nor do they cite any authority that supports their contention that the trial court abused its discretion by utilizing Rule 191(b)—which specifically governs discovery on section 2-619 motions to dismiss—in managing the discovery on KBS's motion to dismiss. As a result, plaintiffs have waived this contention. See Ill. S. Ct. R. 341(h)(7) (requiring that the argument section of appeals briefs "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009) ("The failure to assert a well-reasoned argument supported by legal authority is a violation of Supreme Court Rule 341(h)(7) [citation], resulting in waiver."); *Thrall Car*

*Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986) ("A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.").

¶ 50    Moreover, even putting waiver aside, plaintiffs make no contention that the trial court's method of managing discovery on this matter prejudiced them in any way. Accordingly, we do not agree that the trial court committed reversible error in this respect. *In re Marriage of Solano*, 2019 IL App (2d) 180011, ¶ 39 ("A ruling denying or limiting discovery does not constitute reversible error unless the complaining party demonstrates prejudice.").

¶ 51    Plaintiffs also argue that the trial court abused its discretion in denying plaintiffs leave to depose Hartmann, Fiduccia, and Save-A-Lot's store manager and in restricting the discovery of emails, ESI, texts, and memoranda of telephone conversations to the store in question and to the six months preceding Michael's fall. We disagree. Before the trial court was required to act on plaintiffs' Rule 191(b) affidavits, the affidavits were required to include the following:

> "(1) a statement that material facts are unavailable due to hostility or otherwise; (2) the names of those persons the affiant wants to depose; (3) a showing as to why affidavits could not be procured from those named persons; (4) a statement as to what those persons will testify; (5) the basis for the affiant's belief that those persons will so testify; and (6) the affiant must be a party to the action." *Koukoulomatis v. Disco Wheels, Inc.*, 127 Ill. App. 3d 95, 99 (1984).

Where the required information is not contained in the affidavit, the trial court is within its discretion to strike the affidavit and/or deny the requested discovery. *Id.*

¶ 52    Here, plaintiffs failed to provide some of the required information in their Rule 191(b) affidavits. With respect to the requested depositions of Hartmann, Fiduccia, and Save-A-Lot's store manager, Smith, other than stating that the depositions were necessary to discover information regarding KBS's control over S&L's work, plaintiffs made no effort to describe what they believed these individuals would testify or their basis for believing these individuals would so testify. Similarly, other than the vague contention that the emails, ESI, texts, and memoranda of telephone conversations from other stores and dating back ten years would somehow produce information relevant to KBS's control over S&L at the time of Michael's fall, plaintiffs provided no information regarding what they expected to find in those documents or the basis for their belief. For these reasons alone, the trial court did not abuse its discretion in denying plaintiffs' request for additional discovery in these respects. *Id.*

¶ 53    Moreover, we observe that the trial court took a careful, calculated approach to conducting discovery on the issues presented in KBS's motion to dismiss, balancing both plaintiffs' need to explore the issue of KBS's control over S&L and the need to limit such discovery to that which was reasonably calculated to lead to relevant evidence. To do so, the trial court took discovery step by step, basing its decisions of whether to permit further discovery on what was learned from previous discovery. Following the depositions of Luckos and Johnson and the production of the parties' contracts and emails between KBS and S&L regarding the store at issue in the six months leading up to Michael's fall, the trial court determined sufficient discovery had been conducted on the issue of control to permit plaintiffs to respond to KBS's motion to dismiss. Given that both Luckos and Johnson—the two people in the best position to testify about the level of control exerted by KBS—essentially testified that KBS exerted no control over the manner in which S&L performed its work and given the 2016 Contract's

provision granting S&L exclusive control over the method and means of performing the work, we see no abuse of discretion in the trial court's determination that further discovery was unlikely to produce any relevant information.

¶ 54　　　Our conclusion in this respect is bolstered by plaintiffs' general statements that they believed further discovery would produce evidence of control, but their inability to articulate what that evidence would be. See *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 658-59 (2002) ("The Fabianos offer no argument as to the relevance of the undisclosed portions of the personnel files but instead suggest that the files 'may' contain evidence relevant to defendants' credibility or suggesting a pattern of misconduct by the defendants. In other words, '[t]he discovery requests were merely a "fishing expedition," which would have been conducted with the hope of finding something relevant.' "). "[T]he right to discovery is limited to disclosure of matters that will be relevant to the case at hand in order to protect against abuses and unfairness, and a court should deny a discovery request where there is insufficient evidence that the requested discovery is relevant or will lead to such evidence." *Leeson v. State Farm Mutual Automobile Insurance Co.*, 190 Ill. App. 3d 359, 366 (1989). Here, based on the testimony and other evidence produced during discovery and the plaintiffs' inability to demonstrate that relevant evidence would be discovered in further discovery, the trial court did not abuse its discretion in denying additional discovery on KBS's motion to dismiss.

¶ 55　　　　　　　　　　　　　　　CONCLUSION

¶ 56　　　For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 57　　　Affirmed.