**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210552-U

Order filed January 23, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| JOSE OROZCO, VALENTINA OROZCO, VICTOR FELIX, and MARCELO RAMOS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois. |
| Plaintiffs-Appellants, | ) ) | |
| | ) ) | Appeal Nos. 3-21-0552, 3-21-0553, 3-21-0559, 3-21-0560 cons. |
| v. | ) | Circuit No. 17-L-205 |
| | ) | |
| JOHN EDGAR, Individually and as Agent and Employee of OVERHEAD MATERIAL HANDLING ILLINOIS, INC., and IRON-HORSE CRANES, INC., and GKN n/a/k/a POWERTRAIN ROCKFORD, INC., | ) ) ) ) ) ) | |
| Defendants | ) ) | Honorable Troy D. Holland, |
| (GKN, Defendant-Appellee). | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| PATRICIA PINA, Individually and as Guardian of the Estate of Agustin Pina, A Disabled Person, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) ) | Appeal Nos. 3-21-0552, 3-21-0553, 3-21-0559, 3-21-0560 cons. |
| v. | ) | Circuit No. 19-L-138 |
| | ) | |
| GKN; OVERHEAD MATERIAL HANDLING ILLINOIS, INC., Individually | ) ) | |

and as Agent of GKN; IRON-HORSE )
CRANES, INC., Individually and as Agent of )
GKN and OVERHEAD MATERIAL )
HANDLING, INC.; JOHN EDGAR, )
Individually and as Agent of GKN, )
IRON-HORSE CRANES, INC., and )
OVERHEAD MATERIAL HANDLING, INC., )
)
       Defendants )   Honorable
)   Troy D. Holland,
(GKN, Defendant-Appellee). )   Judge, Presiding.

_____

| | |
|---|---|
| ARACELI VALDEZ, as Special Administrator ) | Appeal from the Circuit Court |
| of the Estate of FLAVIO SHANCHEZ CHIA, ) | of the 13th Judicial Circuit, |
| ) | La Salle County, Illinois. |
|    Plaintiff-Appellant, ) | |
| ) | Appeal Nos. 3-21-0552, 3-21-0553, |
| ) | 3-21-0559, 3-21-0560 cons. |
|    v. ) | Circuit No. 19-L-144 |
| ) | |
| OVERHEAD MATERIAL HANDLING, INC., ) | |
| and GKN ROCKFORD, INC., ) | |
| ) | |
|    Defendants ) | Honorable |
| ) | Troy D. Holland, |
| (GKN, Defendant-Appellee). ) | Judge, Presiding. |

_____

| | |
|---|---|
| JUSTIN MAJERCZYK, ) | Appeal from the Circuit Court |
| ) | of the 13th Judicial Circuit, |
| ) | La Salle County, Illinois. |
|    Plaintiff-Appellant, ) | |
| ) | Appeal Nos. 3-21-0552, 3-21-0553, |
| ) | 3-21-0559, 3-21-0560 cons. |
|    v. ) | Circuit No. 20-L-101 |
| ) | |
| JOSE OROZCO; THOMAS JURJOVEC; ) | |
| JOHN EDGAR; OVERHEAD MATERIAL ) | |
| HANDLING ILLINOIS, INC.; and ) | |
| POWERTRAIN ROCKFORD, Inc., ) | |
| d/b/a GKN, ) | |
| ) | |
|    Defendants ) | Honorable |
| ) | Troy D. Holland, |
| (GKN, Defendant-Appellee). ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices McDade and Davenport concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court properly entered summary judgment in favor of defendant on the vicarious liability and direct negligence claims. Affirmed.

¶ 2    This is a wrongful death and personal injury case arising out of a vehicle collision. Plaintiffs in the underlying consolidated action appeal from the trial court's order granting summary judgment in favor of the defendant manufacturing company, GKN, on plaintiffs' vicarious liability and direct negligence claims. For the reasons set forth below, we affirm.[1]

¶ 3                                     I. BACKGROUND

¶ 4    The following is derived from the pleadings, depositions, admissions, and affidavits on file. The November 15, 2017, collision giving rise to this matter was between a Ford F-350 commercial service truck driven by John Edgar and a Nissan Pathfinder driven by Jose Orozco. The truck crashed into the Pathfinder after Edgar failed to observe a stop sign at an intersection. Edgar's passenger in the truck was his co-worker—Justin Majerczyk. Orozco's passengers in the Pathfinder were his co-workers—Flavio Sanchez Chia, Agustin Pina, Victor Felix, and Marcelo

---

[1]The over 30,000-page combined record on appeal reflects a second lawsuit filed by Valdez against other defendants, with a trial court docket number 17-L-192. However, plaintiffs refer to only four underlying actions without further explanation. Also, named defendants include variations of GKN's name, including GKN, GKN Rockford, Inc., and Powertrain Rockford. On appeal, however, all parties refer to the entity as GKN only.

Ramos. As a result of the collision, Sanchez Chia was killed; Pina was rendered a quadriplegic; and Orozco, Felix, Ramos, and Majerczyk suffered injuries.

¶ 5    Plaintiffs in the underlying consolidated action are, collectively, Araceli Valdez (as special administrator of the estate of Sanchez Chia), Patricia Pina (individually and as guardian of the estate of Pina), Orozco, Valentina Orozco (Orozco's wife), Felix, Ramos, and Majerczyk. Defendants include Edgar, Iron-Horse Cranes, Inc. (Iron-Horse), Overhead Material Handling Illinois, Inc. (Overhead), and GKN. Plaintiffs brought vicarious liability and direct negligence claims against GKN. The vicarious liability claims alleged that Edgar, Iron-Horse, and Overhead were agents of GKN.

¶ 6    As relevant to this appeal, we recount the relationship among the defendants, the circumstances surrounding the collision, and the procedural history.

¶ 7                                    A. Defendants

¶ 8                              1. Edgar/Iron-Horse/Overhead

¶ 9    Iron-Horse and Overhead share office space in Villa Park. Iron-Horse performs a variety of services, including inspecting and repairing industrial cranes. Overhead assigns inspections to Iron-Horse technicians and dispatches them to the customer's job sites. Overhead's owner testified that Overhead manages the sales and marketing end of the business, while Iron-Horse provides the services. Overhead is a "front line for the customers to call" and a broker for the services.

¶ 10    Iron-Horse sends weekly or bi-weekly invoices to Overhead for its work. Overhead, in turn, sends invoices to clients for the work performed by Iron-Horse technicians, and the clients pay Overhead. Iron-Horse receives 100% of its revenue from Overhead.

¶ 11    Iron-Horse pays the technicians, provides benefits (including health insurance), deducts taxes from their wages, and furnishes W-2s. Iron-Horse also provides the technicians with

uniforms (with Overhead's name and logo), on-the-job training to perform inspections, and service vehicles with the requisite tools and equipment for inspections and repairs. If technicians need additional parts or tools, they pick them up at Overhead's facility in Villa Park before driving to the customer's job site. Otherwise, the technicians typically drive directly from their homes to the customer's job site. Edgar and Majerczyk are technicians employed by Iron-Horse.

¶ 12                                                    2. GKN

¶ 13    GKN is a manufacturing company that makes mechanical components for vehicles. Its facility in Loves Park is equipped with approximately 100 overhead cranes used to move, test, ship, and construct components. GKN personnel perform monthly preventative maintenance on the cranes. However, the Occupational Health and Safety Administration (OSHA) requires that an outside company conduct annual, on-site inspections of GKN's cranes.

¶ 14    The outside company that conducted the inspections for several years was Overhead—a GKN-approved vendor. With respect to the 2017 annual inspection of GKN's cranes, Jennifer Davis, GKN's senior buyer, requested a quote for services from Overhead. Jeff Downing, an Iron-Horse employee, corresponded with Davis through an Overhead e-mail address to provide the quote and schedule the inspection. We turn to the content of the quote.

¶ 15                                                    a. Quote

¶ 16    Overhead provided an "OSHA Periodic Inspection Quotation" of $7985 for the annual inspection of GKN's cranes. The quote specified that Overhead would "provide the Periodic Inspection Services prescribed by the OSHA requirements for Overhead Cranes in section 1910.179 and as recommended in ASME/ANSI/B30 Standards." The quote further specified that the service was "intended to help prevent costly down time and repairs to your material handling

- 5 -

systems and minimize damage to the products and materials being handled" and stated that "[m]ost of all this service will enhance the safety of all employees working in the vicinity."

¶ 17    The scope of the inspection was described as follows:

> "This inspection will ensure OSHA compliance, and report the condition of the equipment: structurally, mechanically, and electrically. This inspection will include but [is] not limited to: tightening all bolts, and screws, adjusting the brakes, checking the oil level in the gearboxes (changing oil is not included)[,] checking the condition of the wire rope, rope guides, contactors, and a visual inspection of the complete crane and hoist system. We have not included load testing. After the inspection[,] a report will be prepared listing the condition of the equipment with the recommendations or repairs and/or replacement of any part(s) found to be worn, damaged[,] or not in compliance."

¶ 18    In addition, the quote provided that Overhead would "furnish labor, tools[,] and equipment for inspection" of the cranes. An "Added Value" section explained that "[e]ach service technician's vehicle is stocked with a full inventory of the most common parts that wear and fail (*i.e.*[,] contactors, fuses, controls, brakes)." According to the quote, "[t]his inventory means saving the cost of a second trip, additional time, and even possible down time by being able to perform some or all repairs immediately." The quote explained that "[o]ur service personnel will advise you of any parts that need to be replaced or service that needs to be preformed [*sic*]," that "[a]ny additional work will be authorized before the work is preformed [*sic*]," and that "[t]he cost of the parts and additional labor can be obtained from [Overhead]."

¶ 19    The quote concluded that "[t]he inspections are based on the work being performed during regular (possible extended) working hours on a five day a week basis (Monday-Friday)" and that

other times "can and will be arranged at your request." Also, the inspectors needed to be given "free and clear access to the equipment on an uninterrupted basis."

¶ 20 GKN's health safety and environmental manager approved the quote. On November 13, 2017, GKN issued a purchase order to Overhead, as detailed below.

¶ 21                                             b. Purchase Order

¶ 22 The purchase order was addressed to Overhead and reflected Overhead's quoted price of $7985 for the 2017 annual inspection. The purchase order provided that acknowledgement of the order was vital to GKN's planning process and that compliance with the stated delivery date was a requirement of the purchase order.

¶ 23 The second page of the two-page purchase order set forth GKN's "General Purchasing Conditions," which, according to GKN, were standardized conditions that GKN issued to all contractors. Conditions included 10 main categories, including sections entitled Delivery; Quality, Rejection, and Indemnity; and General.

¶ 24 The Delivery section provided: "Time is of the essence. You must deliver goods and/or services that we order in accordance with the delivery terms and dates set out in the Contract. If any goods and/or services are not delivered on time or are delivered incorrectly, we may terminate the relevant Order." This section further provided that "[d]elay or failure in performance may be excusable only for natural disasters, governmental restrictions, war or civil unrest, and only to the extent they are unforeseeable, the delay is beyond your reasonable control, and you give us prompt written detailed notice."

¶ 25 The Quality, Rejection, and Indemnity section specified that all services supplied must be "performed efficiently, safely and competently by suitably qualified and experience personnel in conformity with any applicable industry code of practice" and "of the quality which would

- 7 -

reasonably be expected from a skilled and experienced operator providing equivalent services in the same circumstances." Moreover, services were required to "comply with all applicable legal requirements and regulations, including those related to transportation, health, safety and the environment." Likewise, the General section required that "[y]ou and your suppliers must comply with "all applicable laws, regulations, and codes" and that "[y]ou and your subcontractors shall abide by the requirements of [regulations prohibiting discrimination]."

¶ 26 Iron-Horse employee Downing testified that the quote and purchase order were similar to those Overhead exchanged with its other customers. Downing further testified that Overhead maintained the ability to reschedule the inspection if necessary. For instance, GKN initially agreed to the beginning date of November 6, 2017, for the inspection, but Overhead rescheduled the inspection to November 13, 2017, without objection from GKN.

¶ 27 GKN did not impose a deadline for completion of the inspection. Rather, Davis testified that "inspections are [a] priority for our safety of our employees and our business. So if there's an issue and it needed to be extended out[,] then it gets extended out until it's completed."

¶ 28 Downing testified that he determined the number of technicians assigned to each inspection. Downing informed GKN that Overhead planned to send two technicians for the annual inspection, beginning on Monday, November 13, 2017, and scheduled to last for five days. Downing assigned Edgar and Majerczyk to conduct the 2017 annual inspection. Neither Edgar nor Majerczyk read the terms of the purchase order.

¶ 29                          c. 2017 Annual Inspection

¶ 30 GKN's environmental, health, and safety manager testified that, prior to any contractor's arrival at GKN's facility, the contractor is provided GKN's "Rules & Conditions of Job

Registration" form. The form outlines rules and conditions, including that contractors must provide all necessary personal protection for their employees.

¶ 31 When Edgar and Majerczyk arrived at GKN's facility on the first day of the inspection, Monday, November 13, 2017, they checked in using a computerized system in the lobby and were given name badges that all non-employees were required to wear in the facility. They also underwent a brief orientation that consisted of viewing a safety video and completing an orientation checklist. The checklist provided a review of GKN's safety policies and rules, including, for instance, a prohibition on smoking, loose jewelry, firearms, or hazardous chemicals at the facility. According to both Edgar and Majerczyk, GKN's orientation was typical of the customers they serviced. Each facility and customer had its own safety rules and regulations that the technicians were required to follow.

¶ 32 Majerczyk testified that he could be, but never was, fined for violating GKN's safety rules. The testimony established that GKN could dismiss a contractor from its facility for failing to abide by the safety rules and endangering the lives or safety of others. However, GKN did not have the right to terminate a technician's employment with Iron-Horse.

¶ 33 Majerczyk further testified that the technicians were required to check in at GKN's facility by 7 a.m. daily. When questioned as to the source of the check-in time, Majerczyk testified that "[i]t was established with the customer itself" and that the customer was GKN. According to Majerczyk, there were penalties in terms of "dollars and cents" for late arrival. However, Majerczyk testified that he was not aware of any instances where GKN fined or penalized any technicians. He also acknowledged that he could take "pretty much as much time as [he] need[ed]" to complete the inspection.

¶ 34    Iron-Horse employee Downing likewise testified that GKN never penalized technicians for failing to arrive at its facility by a specific time. GKN never complained to Overhead or Iron-Horse about technicians arriving after 7 a.m. Representatives from both GKN and Iron-Horse testified that GKN did not implement, enforce, or require a specific start time for the inspection.

¶ 35    Edgar testified that 7 a.m. was the general start time under Iron-Horse policy for all clients, not just GKN. Edgar acknowledged that a crane is not operational while being inspected and affects productivity. Edgar also acknowledged that there is "more of a rush" to complete the inspection in an operational facility than in a facility that is shut down for the inspection.

¶ 36    GKN personnel suggested the starting point for the annual inspection based upon ease of access and convenience, but the technicians ultimately decided the order in which the cranes were inspected. Majerczyk testified regarding instructions that GKN personnel provided during the inspection, including a direction to change locations and to use a different type of lubricant on a particular machine because "they did not like the result of what [he] was using." According to Majerczyk, he and Edgar were "told what to do, when to do, and how to do it." Examples included the location to park their lifts and hoists, "how you are doing what you [are] doing," and the restriction on wearing jewelry during the inspection.

¶ 37    The evidence established that the technicians performed the inspection and prepared their reports using "InspectAll"—a program on their Iron-Horse iPads. The technicians inputted a machine's manufacturer, model, and type, and the program instructed as to which parts needed inspection and provided a checklist for the technicians' work. GKN did not require or request that the technicians use InspectAll and did not have access to the iPads or the InspectAll program.

¶ 38    Edgar and Majerczyk drove to GKN on a daily basis for the inspection in separate Overhead service trucks from their homes in Wheeling and Sheridan, respectively. GKN had no

input on the manner in which the technicians traveled to its facility or their route to the facility. On the second day of the inspection, Majerczyk's service truck broke down. Timothy Day, Overhead's vice-president of sales and Iron-Horse's owner and president, testified that he directed Edgar to pick up Majerczyk from Majerczyk's home before proceeding to GKN's facility for the third day of the inspection.

¶ 39                                    B. Collision

¶ 40    The collision in this matter occurred at approximately 6:35 a.m., on Wednesday, November 15, 2017, as the technicians drove to GKN's facility for the third day of the inspection. Edgar testified that he left his home at approximately 3:45 a.m. or 4 a.m. that day to pick up Majerczyk. Edgar arrived at Majerczyk's home between 5:30 a.m. and 6:15 a.m. After loading the materials from Majerczyk's truck into Edgar's truck and smoking a cigarette, they proceeded to GKN's facility pursuant to a route determined by the service truck's GPS.

¶ 41    Approximately 5 to 15 minutes after leaving Majerczyk's home, as Edgar drove the truck north on East 1950th Road at 55 miles per hour, he approached the intersection with Route 34 in Adams Township, La Salle County. Meanwhile, Orozco and his co-workers were en route in the Pathfinder from their homes in Mendota to their place of employment in Naperville and heading east on Route 34 toward the same intersection. There was a stop sign at the intersection for northbound traffic on East 1950th Road. Edgar drove through the stop sign without slowing, stopping, or yielding, and collided with the Pathfinder.

¶ 42    Majerczyk testified that the crash resulted from Edgar "trying to meet GKN's time requirements." However, Edgar testified that he was not rushing to reach GKN's facility; rather, he testified that he never saw the stop sign. Majerczyk confirmed that Edgar was driving the speed limit during the entire trip.

¶ 43    Soon after the collision, at 7:27 a.m., Iron-Horse employee Downing e-mailed a GKN representative to inform him that the inspection needed to be postponed because the technicians had been in an accident. Downing advised that he would follow up to schedule the remainder of the inspection. The GKN representative responded by thanking Downing for the update, telling him that "[t]he main thing is they are ok," and advising Downing to contact GKN when the technicians could return to finish the inspection.

¶ 44    GKN and Overhead corresponded 16 days later, on December 1, 2017, to reschedule the inspection for December 5, 2017. Downing assigned a different technician to complete the inspection. On December 16, 2017, after the inspection was completed, Overhead e-mailed GKN a report entitled "2017 Periodic Inspection and Services Report" with a notation, stating, "Service Performed by: Iron-Horse Cranes, Inc." On December 18, 2017, Overhead sent GKN an invoice for the inspection services. The invoice included the quoted $7985 annual inspection fee and additional charges for extra hours, shipping, and a top hook. The invoice included a section itemizing "Work/Travel hours" and billed for travel time and mileage from Overhead's facility in Villa Park to GKN's facility in Loves Park. GKN paid the invoice.

¶ 45                                        C. Procedural History

¶ 46    Beginning in December 2017, four separate lawsuits arising out of the collision were filed, two in Cook County and two in La Salle County. The Cook County lawsuits were transferred to La Salle County, and all four lawsuits were consolidated for discovery purposes in the underlying action.

¶ 47                                        1. Claims

¶ 48    Collectively, plaintiffs' operative complaints alleged, in relevant part, direct negligence claims against Edgar, Iron-Horse, Overhead, and GKN, and negligence claims premised on a

- 12 -

theory of vicarious liability against the three corporate defendants (including an alleged joint venture between Iron-Horse and Overhead).

¶ 49　Regarding the vicarious liability claims against GKN, plaintiffs alleged that service technicians, like Edgar, acted in furtherance of the purchase order, were paid for travel time, and were thus "on the clock" while driving to GKN. Accordingly, plaintiffs alleged that GKN was vicariously liable as a principal for the negligence of its alleged agents, Edgar, Iron-Horse, and Overhead.

¶ 50　With respect to the direct negligence claims against GKN, plaintiffs alleged that GKN was negligent in requiring the inspection to "be performed in an unrealistic, expeditious fashion as time was of the essence," as set forth in the purchase order. Plaintiffs alleged that GKN imposed an unreasonable deadline for completion of the inspection to minimize its financial losses from lost productivity. According to plaintiffs, the unreasonable deadline and required daily check-in time caused Edgar to rush to GKN's facility, resulting in his failure to observe plaintiffs' oncoming vehicle and decrease his speed or stop at the intersection.

¶ 51　　　　　　　　　　2. Summary Judgment Motions

¶ 52　Following discovery, the parties filed motions for summary judgment on several issues. Initially, while not germane to this appeal, we note that the trial court granted Pina's motion for partial summary judgment against Edgar and Iron-Horse on the issues of Edgar's negligence and Iron-Horse's vicariously liability for Edgar's negligence. The trial court also denied Pina's and Overhead's cross-motions for summary judgment on the issue of whether Overhead acted in a joint venture with Iron-Horse and/or whether Iron-Horse was an agent of Overhead such that Overhead was vicariously liable for the actions of Edgar as Iron-Horse's employee.

¶ 53    Turning to the motions pertinent to this appeal, GKN moved for summary judgment in each of the four consolidated cases. GKN argued that it was entitled to summary judgment on the vicarious liability claims because the undisputed facts established that Edgar, Iron-Horse, and Overhead were independent contractors, not GKN's agents. GKN also argued that it was entitled to summary judgment on the direct negligence claims because it did not owe plaintiffs a duty as a matter of law.

¶ 54    In opposition to summary judgment, plaintiffs argued that there were genuine issues of material fact with respect to the agency relationship between GKN and Edgar, Iron-Horse, and Overhead. Plaintiffs also argued that GKN owed plaintiffs a duty of care and that there were genuine issues of material fact with respect to whether GKN's breach of the duty proximately caused plaintiffs' injuries.

¶ 55                              3. Summary Judgment Ruling

¶ 56    Following argument, on October 28, 2021, the trial court issued a written order, granting GKN's motions for summary judgment on all claims. The court found that the undisputed material facts established that "Iron-Horse/Overhead" and their employee Edgar were independent contractors, not GKN's agents. Addressing the primary consideration of whether GKN had the right to control the manner of work performance, the trial court reasoned that the purchase order did not set forth any specific right of GKN to control the manner in which the technicians performed the inspection other than general provisions about following applicable codes and laws and performing the work safely. Moreover, the testimony of GKN representative Davis indicated that the "General Purchasing Conditions" set forth in the purchase order were the type that GKN required of all contractors. The purchase order set forth no specific start time, and the schedule of days that Overhead was to perform the inspection changed at Overhead's request.

¶ 57    The trial court also reasoned that any alleged control that GKN exercised at its facility related to general safety regulations and protocols for contractors and visitors, not to the manner in which the technicians actually performed the inspection. While GKN retained the right to terminate the purchase order for various reasons, GKN had no right to terminate a technician's employment with Iron-Horse.

¶ 58    In addition, the trial court found that GKN "did not have the right to control or did not control Edgar *** on his way to GKN's facility ***." Edgar testified that his travel instructions came from Iron-Horse. Indeed, Iron-Horse arranged for Edgar to pick up Majerczyk at his home on the morning of the collision because Majerczyk's service vehicle broke down. The trial court further found that GKN did not dictate the start time for the technicians. Edgar testified that 7 a.m. was the general start time for all clients pursuant to Iron-Horse policy. Majerczyk testified that he could be fined for being late. However, there was no provision for fines in the purchase order, and Majerczyk was unaware of any instances where GKN fined or penalized any technicians.

¶ 59    The trial court found insufficient evidence that Edgar and Majerczyk were "on the clock" and being compensated while en route to GKN's facility. GKN did not pay technicians directly for travel time. Rather, GKN paid Overhead's invoices that were submitted after the inspection. The invoices included the unit price of the inspection as well as a bill for "work/travel hours," which was based upon the miles from Overhead's facility in Villa Park to GKN's facility in Loves Park, not from the technicians' individual residences. According to the trial court, "[w]hile Edgar's work day and compensation from Iron-Horse may have started when he began his trip to GKN's facility to do the inspections[,] that does not equate to being on GKN's clock as an agent."

¶ 60    In addition to the lack of right to control, the trial court considered the work performed by Overhead and Iron-Horse in relation to the general business of GKN. Reasoning that they are

- 15 -

"completely separate types of business[es]," the trial court noted that "Overhead/Iron-Horse sell, service and inspect material handling equipment such as bridge cranes and crane hoists," whereas "GKN manufactures mechanical components such as drive shafts, fan clutches and fan drives." GKN uses cranes and hoists to lift heavy material and is required to have an outside party, such as Overhead, conduct the annual OSHA inspection of the cranes.

¶ 61    In concluding that there were no genuine issues of material fact with respect to the independent contractor status of Edgar, Iron-Horse, and Overhead, the trial court noted other factors that demonstrated the lack of an agency relationship. Namely, "GKN paid a set price and [*sic*] and invoices directly to Overhead with no direct payment whatsoever to Edgar/Iron-Horse." Also, "GKN had no connection to paying the technicians and did not withhold taxes, social security, insurance or any other deductions from Edgar's earnings and did not insure Edgar or the service truck he was driving." The trial court further pointed out that "Overhead/Edgar provided Edgar's service vehicle and the tools, parts and computer program/computer pads needed to perform the inspection." Regarding plaintiffs' claim that the technicians used GKN's scissor lift, the trial court found no "clear evidence from any witness or documents that anyone from Overhead/Iron-Horse did in fact use GKN's scissor lift for this inspection." And finally, the trial court reasoned that "[t]he evidence indicates that the inspection services ordered by GKN required a level of skill such that the services had to be performed by a company outside of GKN."

¶ 62    The trial court rejected plaintiffs' argument that Majerczyk's deposition testimony created genuine issues of material fact as to the existence of an agency relationship. In doing so, the trial court found that Majerczyk "does not provide a sufficient factual foundation to base his statements and at times he completely contradicts the testimony of the driver Edgar," including Edgar's testimony that he was not rushing and simply did not see the stop sign and Edgar's testimony that

Iron-Horse dictated the technicians' start time. Moreover, Majerczyk testified that he neither read nor was aware of the specific language of the purchase order. Thus, the trial court found that Majerczyk's testimony about penalties for tardiness was speculative and without foundation or support in the purchase order or any other evidence. And finally, the trial court concluded that Majerczyk's testimony regarding control during the inspection relate to GKN's safety regulations and protocols, not to GKN's control or right to control the actual work of the inspection. In sum, the trial court found "no disputed issues of material fact that Iron-Horse/Overhead and their employee Edgar were acting as an independent contractor and not an agent of GKN at the time of the accident."

¶ 63     Turning to plaintiff's direct negligence claims, the trial court likewise found no genuine issues of material fact. Finding the time-is-of-the-essence clause in the purchase order insufficient to support the claim, the trial court reasoned that Edgar was not aware of the clause and testified that he was not rushing to GKN. The trial court concluded that "it was not reasonably foreseeable that such a clause in GKN's contract with Overhead would likely result in the technician failing to stop at the stop sign and collide with another vehicle" and that the magnitude and burden of guarding against such liability under the circumstances would be unreasonably high. Thus, GKN did not owe plaintiffs a duty of care.

¶ 64     Accordingly, the trial court granted GKN's motions for summary judgment. In its written order, the trial court entered a finding, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), that there was no just reason to delay enforcement or appeal of its order granting summary judgment in GKN's favor. Plaintiffs timely filed their respective notices of appeal. This court granted plaintiffs' motion to consolidate the appeals.

¶ 65                                    II. ANALYSIS

¶ 66    Initially, we note GKN's argument that plaintiff Valdez waived her right to appeal the summary judgment ruling by failing to participate in the briefing and argument on the motion in the trial court and by failing to file a separate record on appeal. However, for the reasons set forth below, we affirm summary judgment in GKN's favor and therefore need not address this argument. We turn to plaintiffs' challenges to the summary judgment ruling.

¶ 67    Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). In determining whether there is a genuine issue of material fact, the pleadings, depositions, admissions, and affidavits must be construed strictly against the movant and liberally in favor of the opponent. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162 (2007). A triable issue of fact exists where the material facts are disputed or where, although the material facts are undisputed, reasonable minds might draw different inferences from those facts. *Id.* at 162-63. While summary judgment may aid in the expeditious disposition of a lawsuit, it is a drastic measure and, thus, should be allowed only where the movant's right to judgment is "clear and free from doubt." *Id.* at 163. We review summary judgment rulings *de novo*. *Id.*

¶ 68    With these concepts in mind, we address whether the trial court properly entered summary judgment in GKN's favor on the vicarious liability and direct negligence claims.

¶ 69                                    A. Vicarious Liability

¶ 70    The general rule is that a plaintiff injured by another's tortious action must seek a remedy from the person who caused the injury. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 42. The principal-agent relationship (or agency relationship) is an exception to this rule. *Id.* Under the doctrine of *respondeat superior*, a principal may be held vicariously liable for the

tortious actions of an agent. *Id.* However, generally, no vicarious liability exists for the actions of an independent contractor. *Id.*

¶ 71    The defining distinction between an agency relationship and an independent contractor relationship is the right to control the manner of work performance. *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 13 (2004). That is, an agency relationship is one in which the principal has the right to control the agent's conduct, whereas an independent contractor relationship is one in which an independent contractor undertakes to produce a given result but, in the execution of the work, is not under the control of the person for whom the work is done. *Sperl v. C.H. Robinson Worldwide, Inc.*, 408 Ill. App. 3d 1051, 1057 (2011).

¶ 72    Accordingly, in determining whether a person is an agent or an independent contractor, "the cardinal consideration is the right to control the manner of work performance, regardless of whether that right was actually exercised." *Id.* The test for determining the existence of an agency relationship is "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Bowyer as Next Friend of Eskra v. Adono*, 2020 IL App (3d) 180685, ¶ 37 (citing, *inter alia*, Restatement (Second) of Agency §§ 2, 220 (1958)).

¶ 73    Another significant factor in determining the existence of an agency relationship is the nature of work performed relative to the principal's general business. *Sperl*, 408 Ill. App. 3d at 1057-58. Other factors to consider are the right to discharge; the method of payment; the provision of necessary tools, materials, and equipment; whether taxes were deducted from the payment; and the level of skill required to perform the work. *Id.* at 1058. No single factor is determinative, and the significance of each may vary depending upon the work involved. *Id.*

¶ 74   Application of the foregoing factors to the undisputed, material facts of this case demonstrates that Edgar, Iron-Horse, and Overhead were independent contractors, and not agents of GKN.

¶ 75                                          1. Control

¶ 76   With respect to the control issue, the parties frame their arguments around GKN's right to control and control over the manner of the technicians' work performance while at the facility and during the commute to the facility. We address each issue in turn.

¶ 77   Regarding control at the facility, plaintiffs contend that GKN "controlled the when, where, and how to perform their inspection services." In support, they cite Majerczyk's testimony that GKN instructed the technicians as to the starting point for the inspection and the type of lubricant for use on a particular machine. A review of the entire record demonstrates that this testimony does not create a genuine issue of material fact.

¶ 78   Initially, as mandated by OSHA, an *outside* company was required to conduct the annual inspection of GKN's cranes. Thus, the very nature of the inspection reflected an inherent lack of GKN control over the manner in which the technicians performed the inspection. The lack of control was borne out by Overhead's quote, the purchase order, and the inspection process.

¶ 79   Overhead's quote for the annual inspection stated that Overhead, not GKN, would furnish all labor, tools, and equipment for the inspection. Overhead's quote further mandated that its technicians be given "free and clear access to the equipment on an uninterrupted basis." Overhead assigned Edgar and Majerczyk to conduct the inspection. GKN neither selected nor requested specific technicians and played no role in the assignment process.

¶ 80   Plaintiffs also cite the "General Purchasing Conditions" in the purchase order as evidence of GKN's right to control the inspection process. However, the testimony established that these

were standard conditions that GKN issued to all contractors and included the unremarkable requirement to comply with all applicable laws, regulations, and codes. There was nothing in the purchase order that gave GKN the right to control the manner in which Overhead performed the inspection. Any alleged control that GKN exercised at its facility related to general safety regulations and protocols for contractors, not to the manner in which the technicians performed the inspection.

¶ 81 Indeed, GKN did not train the technicians on how to perform the inspection. Rather, the technicians performed the inspection and prepared their reports with InspectAll—an inspection program installed on the iPads supplied by Iron-Horse. GKN had no access to the iPads or the InspectAll program. In addition, while GKN could terminate the purchase order, GKN had no right to terminate a technician's employment. Accordingly, the undisputed material facts established that GKN did not have the right to control, and did not control, the technicians while at the facility.

¶ 82 Moreover, the collision occurred miles away from GKN's facility, while the technicians were driving there for the inspection. We thus turn to the issue of GKN's purported right to control the technicians during their commute. Initially, GKN cites the general principle that "an employee traveling to or from work outside actual working hours is not in the scope of employment." *Pyne v. Witmer*, 129 Ill. 2d 351, 356 (1989). Plaintiffs respond that "an exception exists for employees who are caused by their employers to travel away from a regular workplace or whose travel is at least partly for their employers' purpose rather than simply serving to convey the employees to or from a regular jobsite." *Id.*

¶ 83 The parties dispute whether this case falls within the exceptions set forth in *Pyne*. However, we note that *Pyne* and its progeny involve scope-of-employment issues, not whether there was an agency relationship in the first instance. See *Hoy v. Great Lakes Retail Services, Inc.*, 2016 IL App

(1st) 150877, ¶ 31 ("The general rule in *Pyne* suggests the common-sense principle that an employee commuting to or from work is not acting within the scope of employment."). The issue here is GKN's purported control over or right to control the Iron-Horse technicians during their commute to its facility for the inspection such that an agency relationship was formed. A review of the record demonstrates no genuine issues of material fact with respect to this issue.

¶ 84 GKN was not involved in the technicians' travel plans. The technicians typically drove from their homes to the job site in Overhead service trucks. When Majerczyk's service truck broke down on the second day of the inspection, Iron-Horse, not GKN, arranged for Edgar to pick up Majerczyk at his home the next morning before driving to GKN's facility. There was no evidence that GKN knew the travel arrangements, the distance the technicians traveled, or even where they resided.

¶ 85 Plaintiffs nonetheless argue that summary judgment in GKN's favor should be reversed pursuant to this court's decision in *Sperl*, where a freight broker was found vicariously liable for the negligence of a delivery driver. *Sperl*, 408 Ill. App. 3d 1051. The freight broker in *Sperl* was C.H. Robinson Worldwide, Inc. (CHR)—a logistics company that provided transportation-related services. *Id.* at 1052.

¶ 86 One of the carriers with whom CHR contracted was Toad L. Dragonfly Express (Dragonfly). *Id.* at 1052-53. The contract between CHR and Dragonfly specified that Dragonfly was an independent contractor and required that Dragonfly pay the drivers' salaries, charges, and workers' compensation expenses. *Id.* at 1053. Dragonfly employed DeAn Henry as a delivery driver, but Henry owned a tractor-trailer and leased it to Dragonfly. *Id.* at 1052-53. Dragonfly permitted Henry to use its carrier authority to book and deliver her own loads and keep the profit. *Id.* at 1053.

¶ 87    In addition to being a licensed freight broker, CHR was a licensed fruit and produce seller. *Id.* at 1053. In this capacity, CHR entered into a contract with Jewel Food Stores (Jewel) in which CHR purchased produce for Jewel, stored the produce, and arranged for transporting the produce to various grocery stores. *Id.*

¶ 88    The delivery at issue involved Henry, Dragonfly, CHR, and a shipment of potatoes pursuant to CHR's contract with Jewel. *Id.* Specifically, Henry called CHR's transportation manager directly and requested a load. *Id.* The transportation manager offered a load of Idaho potatoes that CHR had recently purchased and specified that CHR required a certain sized, refrigerated trailer for the transport. *Id.* The potatoes were to be loaded and delivered to CHR's Bolingbrook warehouse, where they would be repackaged and shipped to Jewel stores. *Id.*

¶ 89    CHR subsequently sent Dragonfly a load confirmation sheet (LCS) with instructions for the delivery, including verification of package count and that the driver remain in "constant communication with [CHR]," make daily "check calls" by 10 a.m., and meet rigid delivery deadlines. *Id.* at 1054. The LCS also specified that the driver "must pulp all product being loaded on the truck" and that "[i]f pulp temperature is plus or minus 2 degrees from the temperature on the dispatch sheet, driver must call their [CHR] Representative ASAP." *Id.* The LCS concluded that, "[m]ost importantly, the DRIVER must stay in constant communication with Central Product and/or the night crew service." *Id.* All requirements were enforceable by a series of specific fines and deductions from final payment. *Id.*

¶ 90    While Henry was driving the load of potatoes from Idaho to CHR's warehouse, she caused a multiple-car collision on Interstate-55 that resulted in fatalities and serious injuries. *Id.* at 1052. The plaintiffs sued Henry, Dragonfly, and CHR for wrongful death and personal injuries. *Id.* At trial, Henry testified that, given the amount of time she had to deliver the load, she would not have

been able to deliver the load to the warehouse within CHR's schedule without violating federal regulations that limited daily driving time. *Id.* at 1055. Although she did not see the LCS since it was sent directly to Dragonfly, Henry was aware of CHR's system of fines from previous work with CHR. *Id.* Henry testified that CHR's requirements, strict delivery deadline, and system of fines pressured her as a driver and that she would do "everything [she] could" to avoid a fine." *Id.* The jury found CHR vicariously liable for Henry's negligence on the basis that Henry was CHR's agent. *Id.* at 1056.

¶ 91    In affirming the trial court's denial of CHR's motion for judgment notwithstanding the verdict or a new trial, the appellate court held that, despite the contractual evidence that the parties intended an independent-contractor relationship, the parties' conduct reflected an agency relationship. *Id.* at 1057-59. With respect to the element of control, the appellate court reasoned that CHR's "extensive requirements, coupled with Henry's fine-based compliance, directed Henry's conduct during the entire transportation process and support the finding that CHR had the right to control the manner in which Henry performed her job." *Id.* at 1058.

¶ 92    In addition, the appellate court concluded that Henry's services in hauling freight from one location to another were closely aligned with CHR's business of transportation logistics. *Id.* at 1058-59. Addressing the remaining factors to consider in resolving agency, the appellate court reasoned that Henry requested the load directly from CHR. *Id.* at 1059. CHR dispatched Henry and paid her directly for a successful delivery. *Id.* Although Henry owned the tractor-trailer, CHR purchased the potatoes and requested delivery to its Bolingbrook facility. *Id.* In sum, the appellate court noted the presence of critical facts that warranted a finding of an agency relationship, including that CHR owned the product being transported to its warehouse, imposed fines to ensure Henry's compliance with CHR's schedule during the trip, and gave special

instructions that forced Henry to violate federal regulations to avoid fines. *Id.* at 1059-60. "These facts support the inference that CHR controlled the details of Henry's operations, schedule and compensation." *Id.* at 1060.

¶ 93     The critical facts in *Sperl* are not present here. To begin, this is not a broker-carrier case. The parallels that plaintiffs attempt to draw between the parties in *Sperl* and the parties in this case do not align. GKN is not akin to either a logistics company like CHR or to the other defendants in *Sperl*. GKN, a manufacturer of mechanical components for vehicles, contracted with Overhead for its annual OSHA crane inspection. As such, GKN is most akin to Jewel—the customer of the defendant in *Sperl* (and not a party to the lawsuit in *Sperl*). Moreover, as discussed, GKN had no involvement in the technicians' travel. And, unlike CHR's ownership of the load of potatoes in *Sperl*, GKN neither owned nor had any interest in the content of the service truck. Rather, Edgar drove an Overhead service truck filled with Overhead supplies. Finally, there was simply no evidence that GKN pressured the technicians to meet an illegal deadline.

¶ 94     Plaintiffs nonetheless argue that, like the system of fines in *Sperl* meant to ensure compliance with CHR's requirements and deadlines, GKN's required daily check-in time and discretionary ability to cancel the purchase order was evidence of its control over the technicians during their travel to GKN's facility. Plaintiffs' argument centers around Majerczyk's testimony that GKN mandated a 7 a.m. daily check-in time and that the collision occurred because Edgar was rushing to timely arrive.

¶ 95     GKN responds that Majerczyk's testimony was inadmissible as speculative and lacking foundation. GKN also points out that Majerczyk's testimony contradicted Edgar's testimony that he was not rushing and that 7 a.m. was the start time for all clients pursuant to Iron-Horse policy.

Assuming *arguendo* the admissibility of Majerczyk's testimony, this testimony does not create a genuine issue of material fact precluding summary judgment in GKN's favor.

¶ 96 A required daily start time would not equate to a finding of the right to control here. It was undisputed that GKN neither complained nor penalized technicians for failing to arrive at its facility by a specific time. On the day of the accident, when Overhead advised GKN of the accident and postponed the inspection indefinitely, the GKN representative responded by thanking the Overhead representative for the update, telling him that "[t]he main thing is they are ok," and identifying the individuals to contact for rescheduling purposes. The inspection was finalized three weeks later. There was no evidence that GKN imposed an unreasonable deadline upon the technicians or even that it had a deadline for the annual inspection. Indeed, Majerczyk acknowledged that he could take "pretty much as much time as [he] need[ed]" to complete the inspection.

¶ 97 Plaintiffs rely upon the time-is-of-the-essence provision in the purchase order, but it was undisputed that neither Edgar nor Majerczyk read the purchase order. Moreover, the purchase order did not impose a specific deadline for completion of the inspection. Accordingly, the evidence upon which plaintiffs rely does not reflect the right to control or control over the manner of the technicians' work performance.

¶ 98 The appellate court's decision in *Dowe v. Birmingham Steel Corp.*, 2011 IL App (1st) 091997, is illustrative. There, a tractor-trailer collided with a train at a railroad crossing after the truck driver ignored flashing warning lights and attempted to drive through the crossing ahead of the train, killing and injuring passengers on the train. *Id.* ¶ 4. The driver of the tractor-trailer was employed by Melco Transfer, Inc. (Melco)—a carrier that employed drivers to haul goods for various companies. *Id.* ¶ 3. One of the companies was Birmingham Steel Corporation

(Birmingham), with whom Melco had an exclusive assignment agreement. *Id.* ¶¶ 3, 32. The driver had picked up a shipment of steel reinforcing bars from Birmingham's steel mill just before the collision and was scheduled to transport the bars to Ohio. *Id.* ¶ 3. Birmingham was sued under a theory that the driver was Birmingham's agent at the time of the collision and thus vicariously liable for the driver's negligence. *Id.* ¶¶ 6, 12.

¶ 99    In affirming summary judgment in Birmingham's favor, the appellate court concluded that the evidence reflected no agency relationship between the driver and Birmingham. *Id.* ¶¶ 31-33. The fact that the driver was hauling a large volume for Birmingham, considered himself the "house truck" for Birmingham, loaded the truck pursuant to Birmingham's written rules governing the conduct of drivers at its facility, and could be terminated by Birmingham if not driving safely or pursuant to customer complaint, did not establish an agency relationship. *Id.* ¶¶ 32-33. "None of these factors gave [Birmingham] the authority to control the manner in which [the driver] hauled steel from the steel mill." *Id.* ¶ 33.

¶ 100   Rather, the appellate court noted evidence that the driver chose his own route, controlled his own hours, provided and maintained his own equipment, was paid directly by Melco (who also paid the driver's liability and cargo insurance), and performed his job pursuant to rules he received from Melco. *Id.* ¶ 31. In addition, Birmingham had no authority to discharge the driver from his employment with Melco. *Id.* Thus, Birmingham was entitled to summary judgment on the issue of vicarious liability. *Id.* ¶ 28.

¶ 101   Likewise, here, Edgar used the GPS in his service truck to determine his own route, decided when to arrive at Majerczyk's house and when to start driving to GKN's facility, and drove a fully equipped vehicle provided by Overhead. GKN had no authority to discharge Edgar from his employment with Iron-Horse (who paid his wages). There was no evidence that Edgar performed

- 27 -

a high volume of work for GKN or believed he held a special status; GKN did not decide which technicians would work at its facility; and GKN did not have written rules governing the vehicles driven by the technicians.

¶ 102   In sum, the undisputed material facts established that GKN did not have the requisite right to control and did not exercise control over the manner of the technicians' work performance while at the facility or during the commute to the facility.

¶ 103                     2. Relative Nature of Work Performed

¶ 104   Addressing the second factor to consider in determining the existence of an agency relationship—the nature of work performed in relation to the employer's general business— plaintiffs argue that the nature of the annual crane inspection was closely aligned with GKN's general business. According to plaintiffs, GKN could not move or produce its product without the use of the cranes, and thus the cranes were essential to GKN's business. GKN counters that, under plaintiffs' rationale, any business that needs the expertise of an independent contractor would become vicariously liable for the contractor's negligence. We agree that the relative nature of the work performed here does not support the existence of an agency relationship.

¶ 105   As the trial court noted, "Overhead/Iron-Horse sell, service and inspect material handling equipment such as bridge cranes and crane hoists," whereas "GKN manufactures mechanical components such as drive shafts, fan clutches and fan drives." The two business are entirely distinct and were associated here merely because GKN needed an outside party to annually inspect the cranes it uses for its manufacturing business. Contrary to plaintiffs' argument, the alignment of the respective businesses here are not comparable to the alignment of businesses discussed in *Sperl*, where the truck driver's services in hauling freight from one location to another were akin to the defendant's business of transportation logistics. *Sperl*, 408 Ill. App. 3d at 1058-59.

Accordingly, the relative nature of the work performed did not create a genuine issue of material fact precluding summary judgment.

¶ 106                                   3. Other Factors

¶ 107   We turn to the other factors to consider in determining the existence of an agency relationship—the right to discharge; the method of payment and whether taxes were deducted from the payment; the provision of necessary tools, materials, and equipment; and the level of skill required to perform the work.

¶ 108   First, GKN had no right to discharge the technicians from their employment with Iron-Horse. The mere fact that GKN had the ability to terminate the purchase order for untimely work does not reflect an agency relationship. See *Ware v. Industrial Comm'n*, 318 Ill. App. 3d 1117, 1125 (2000) ("The unqualified right to discharge an employee must be distinguished from the ability to terminate a contract for *bona fide* reasons of dissatisfaction.").

¶ 109   Second, Iron-Horse, and not GKN, paid the technicians, deducted taxes from their wages, gave them W-2s, and provided benefits. Plaintiffs argue that "the method of payment and any taxes deducted from payment necessarily includes an analysis of whether Overhead and Iron-Horse operated as a joint venture." This argument misses the point. Whether it was Iron-Horse, Overhead, or an alleged joint venture that paid the technicians and deducted taxes is not dispositive. Rather, the salient point is that it was *not* GKN that did so.

¶ 110   Moreover, contrary to plaintiffs' argument, GKN did not pay the technicians directly for travel time. Rather, GKN paid Overhead's invoices that were submitted after the inspection. The invoices included the unit price of the inspection as well as a bill for "work/travel hours," which was based upon the miles from Overhead's facility in Villa Park to GKN's facility in Loves Park, and not from the technicians' individual residences.

¶ 111   Third, the evidence established that Iron-Horse and Overhead supplied the necessary tools, materials, and equipment for the inspection, including the fully equipped service vehicle, iPads, and computer program. Indeed, the quote explicitly provided that Overhead would "furnish labor, tools and equipment for inspection." Plaintiffs cite e-mail correspondence involving the scheduling of the inspection in which there was an inquiry as to whether the technicians should bring a scissor lift or use GKN's lift. Plaintiffs contend, without citation to the record, that Majerczyk testified that GKN did in fact provide scissor lifts for the inspection. However, given the undisputed evidence regarding Iron-Horse's and Overhead's provision of the requisite tools, materials, and equipment for the inspection, such testimony would not create a genuine issue of material fact.

¶ 112   Regarding the final factor—the level of skill required to perform the work—it was undisputed that the annual OSHA inspection had to be performed by a company outside of GKN. Plaintiffs contend that the level of skill required to conduct the annual OSHA inspection did not vary significantly from the level of skill that GKN personnel used to perform its own monthly preventative maintenance on the cranes. However, the record reflects that the monthly preventative maintenance was ancillary to GKN's manufacturing business and did not necessarily give rise to an inference that GKN had the ability to perform the annual inspection. Regardless, OSHA required an outside annual inspection.

¶ 113   Accordingly, consideration of the foregoing factors does not support the existence of an agency relationship with GKN. In viewing the evidence strictly against GKN and liberally in favor of plaintiffs, we conclude that there were no genuine issues of material fact precluding summary judgment in GKN's favor on the issue of vicarious liability.

¶ 114                              B. Direct Negligence

¶ 115   To sustain a negligence action, a plaintiff must present sufficient factual evidence to establish that the defendant owed the plaintiff a duty of care, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injury. See *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). The existence of a duty is a question of law. *Id.* "The touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Id.* at 436. The following policy considerations inform this inquiry: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant. *Id.* at 436-37.

¶ 116   The bulk of plaintiffs' argument is that GKN owed plaintiffs a duty of care. According to plaintiffs, the collision was reasonably foreseeable given "GKN's unreasonable time requirements and other constraints put on the technicians." Plaintiffs cite the time-is-of-the-essence provision in the purchase order, the technicians' lengthy daily commute, and the alleged rushed nature of their work given GKN's purported lost productivity during the inspection. We disagree. There is no evidence upon which to infer that the collision was reasonably foreseeable, particularly where the technicians were not privy to the purchase order; GKN did not know Edgar's route or that Iron-Horse had instructed Edgar to pick up Majerczyk; and the purchase order provided no deadline for completion of the inspection. As GKN argues, "[i]t would be manifestly against public policy for this Court to declare that businesses owe a legal duty to all commuters simply because they ask their workers to start and stop working at certain times each day."

¶ 117   Regarding the likelihood of the injury, plaintiffs cursorily contend that "requiring workers to travel long distances on a daily basis each day for a week increases the chance for incidents like

this collision." However, there was simply no evidence that the collision here was likely. GKN contracted with Overhead for the annual inspection of its cranes. There is no basis upon which to hold that Edgar's failure to obey the stop sign and cause a collision was a likely consequence of this contract.

¶ 118   And finally, plaintiffs argue that the magnitude of guarding against the risk of accidents and the consequences of placing that burden on GKN are minimal, suggesting that GKN should have provided local accommodations for the technicians to eliminate their lengthy commute. Again, however, there is no evidence that GKN even knew where the technicians lived. Moreover, there is no support for imposing the suggested burden on GKN. Indeed, rejecting an analogous argument, the appellate court in *Behrens v. Harrah's Illinois Corp.*, 366 Ill. App. 3d 1154, 1157 (2006), reasoned that "the magnitude of the burden of guarding against an injury and the consequences of placing that burden on the defendant[] weigh heavily against imposing a duty on an employer to ensure that its off-duty employees drive home safely and sufficiently rested." Likewise, here, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on GKN weigh against imposition of a duty.

¶ 119   Accordingly, we agree with the trial court that there was no duty here as a matter of law. We therefore need not address plaintiffs' argument that there were genuine issues of material fact on the question of proximate cause. In sum, the trial court did not err in granting GKN's summary judgment motions.

¶ 120                                III. CONCLUSION

¶ 121   For the reasons stated, we affirm the trial court's order granting GKN's motions for summary judgment.

¶ 122   Affirmed.